UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MALIK HALL AND AYESHA HALL, individually and p/n/f/o minors ASAH HALL, KAYAH HALL, AND MALIK HALL II,<br><br>               Plaintiffs,<br><br>    v.<br><br>PRESIDENT AND TRUSTEES OF BATES COLLEGE,<br><br>               Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiffs Malik Hall and Ayesha Hall, individually and as parents and next friends of ("p/n/f/o") minors Asah Hall, Kayah Hall, and Malik Hall II, by and through undersigned counsel, Norman, Hanson & DeTroy, LLC, and complain against Defendant President and Trustees of Bates College ("Bates" or "the College") as follows:

INTRODUCTION

Plaintiff Malik Hall (hereinafter "Coach Hall") is a Black, eminently qualified football coach with nearly eighteen (18) years' experience coaching in the National Football League ("NFL") and National Collegiate Athletic Association ("NCAA"). In 2018, the College—in an apparent attempt to address its tortured and well-documented record of institutional racism[1]—hired

---

[1] *See, e.g.*, LETTER FROM BATES COLLEGE PRESIDENT CLAYTON SPENCER (JUNE 15, 2020); LETTER TO SPENCER (JUNE 10, 2020)(asserting the racism and oppression experienced by Bates faculty and staff "as part of their daily existence"); Black At Bates (@blackatbates), INSTAGRAM, https://www.instagram.com/blackatbates/?hl=en (last visited Apr. 7, 2022)(recounting a Black student's experience in which Bates' Athletic Administrators informed him that he was "really smart 'for a football player'" and that he "must be 'the smartest Black athlete on campus'"). True and accurate copies of the referenced documents are attached hereto as **Exhibits A**, **B**, and **C** respectively.

Coach Hall to become its first Black Head Football Coach in its nearly 150-year history. Almost immediately after he accepted the position, however, the College abandoned any pretense that it intended to treat Coach Hall fairly and respectfully, and instead subjected him to repeated and severe racial discrimination by, among other things:

- playing on racist stereotypes by manufacturing stories that he and his Black offensive coordinator had committed sexual assault;

- fabricating claims that he and the same coordinator had arranged for students to have sex with football recruits;

- inventing reports that it had video images of him using anti-gay slurs while speaking to the team;

- prohibiting him from leading the team in optional prayer, but approving the College's white chaplain to do so;

- relegating him and his family to living in a house *that it knew was infested with black mold*; and

- informing him that—as Bates' first Black Head Football Coach—his contract situation was "different" from that of its other employees, and thus needed to be reviewed by its attorney(s) before negotiations on a new contract could begin.

As a result of Bates' discriminatory and disparaging acts, Coach Hall has suffered—and will continue to suffer—economic damages, loss of opportunity, loss of reputation, and mental anguish, and his children have suffered physical and emotional injuries due to their prolonged exposure to the mold-infested house in which they were placed.

<u>JURISDICTION AND PARTIES</u>

1.      This action arises under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, 2000e-2, *et seq.*; the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.*; the Whistleblowers' Protection Act, 26 M.R.S. §§ 831 *et seq*, as enforced through the MHRA; Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; and also includes common law claims of defamation and negligence arising under Maine state law.

2.      Plaintiff Malik Hall is a Black individual who resides in Auburn, Maine.

3.      Plaintiff Ayesha Hall is a Black individual married to Plaintiff Malik Hall, who resides in Auburn, Maine.

4.      Minors Asah Hall, Kayah Hall, and Malik Hall II are Black individuals and the children of Plaintiffs Malik and Ayesha Hall, who reside in Auburn, Maine.

5.      Upon information and belief, Defendant President and Trustees of Bates College is a Maine nonprofit corporation duly authorized to conduct business in the State of Maine with a principal place of business in the City of Lewiston, County of Androscoggin, State of Maine, doing business as ("d/b/a") as Bates College.

6.      Bates is a private liberal arts college located in Lewiston, Maine.

7.      Bates has well in excess of 500 employees for purposes of jurisdiction and damages that may be awarded for violation of the civil rights laws of this matter.

8.      This Court has subject matter jurisdiction over Coach Hall's claims pursuant to 28 U.S.C. §§ 1331, 1367.

9.      Coach Hall has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

10.     On or about June 21, 2021, Coach Hall filed a Complaint of Discrimination with the Maine Human Rights Commission and the U.S. Equal Employment Opportunity Commission.

11.     A true and accurate copy the Complaint of Discrimination is attached hereto as **Exhibit D**.

12.     A true and accurate copy of the Notice of Right to Sue from the Maine Human Rights Commission dated January 7, 2022 is attached hereto as **Exhibit E**.

13. A true and accurate copy of the U.S. Equal Employment Opportunity Commission's Dismissal and Notice of Rights dated April 7, 2022 is attached hereto as **Exhibit F**.

## JURY TRIAL REQUESTED

14. Coach Hall requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

15. In 2003, Coach Hall graduated from the University of Massachusetts Amherst with a Bachelor of Arts degree in Sociology and Education.

16. Coach Hall played Division I Football at the University of Massachusetts Amherst, where he won an Atlantic 10 Championship.

17. While at the University of Massachusetts Amherst, Coach Hall played under Head Coach Mark J. Whipple, formerly a coach for the National Football League's Cleveland Browns.

18. From 2018 through 2021, Coach Hall was employed by Bates as its Head Football Coach.

19. Prior to joining Bates, Coach Hall had extensive, high-level experience coaching football.

20. From February 2004 through November 2005, Coach Hall was the Defensive Line Coach and Co-Special Teams Coordinator for Central Connecticut University.

21. From July 2005 through August 2005, Coach Hall was the Assistant Defensive Line Coach for the National Football League's Detroit Lions.

22. From November 2005 through March 2006, Coach Hall was the Defensive Line Coach and Co-Special Teams Coordinator for Fordham University.

23.     From March 2006 through March 2009, Coach Hall was the Defensive Line Coach for Hofstra University.

24.     From April 2009 through February 2010, Coach Hall was the Defensive Line Coach and Special Teams Coordinator for Fordham University.

25.     From February 2010 through June 2011, Coach Hall was the Defensive Coordinator and Linebacker Coach for Wagner College.

26.     From June 2011 through December 2011, Coach Hall was the Defensive Line Coach for the University of Massachusetts.

27.     From February 2012 through February 2015, Coach Hall was the Defensive Coordinator and Linebackers Coach for Wagner College.

28.     From February 2015 through July 2018, Coach Hall was the Defensive Line Coach for the University of Pennsylvania.

29.     Most recently, Coach Hall served as the Head Football Coach for Bates from July 2018 through July 2021.

30.     In total, Coach Hall has approximately eighteen (18) years of football coaching experience.

31.     On June 13, 2018, Coach Hall began the interview process to become the 20th Head Football Coach for Bates.

32.     Once hired, he would become the first Black Head Coach in Bates' history.

33.     Coach Hall knew that if Bates hired him, it wanted him to move quickly from his Philadelphia, Pennsylvania home to Lewiston, Maine, and begin his work as the Head Football Coach.

34.     Because Coach Hall's wife and three (3) young children would be moving with him, Coach Hall sought assurances from Bates that his family would be able to view potential

5

homes during negotiations, and to move quickly into an acceptable home if negotiations were successful.

35.     Although Bates assured Coach Hall that his family would be able to view potential homes during negotiations, Bates ensured that opportunity never materialized for the Hall family.

36.     Shortly after Coach Hall's interview, Bates offered him the position of Head Football Coach.

37.     On June 16, 2018, Coach Hall signed Bates' contract agreeing to take the job.

38.     Two (2) days later, Coach Hall and his wife drove to Lewiston to view potential homes.

39.     On June 19, 2018, Bates showed Coach Hall and his wife two (2) housing options.

40.     The first was a former Bed & Breakfast located at 52 Ware Street in Lewiston (the "Ware Street House").

41.     The Ware Street House had enough space to accommodate Coach Hall's family, but required a significant amount of work.

42.     The second, located at 93 Bardwell Street in Lewiston (the "93 Bardwell Street House"), was too small to accommodate Coach Hall's family.

43.     Although Coach Hall requested that Bates accommodate his family's size by finishing the basement of the 93 Bardwell Street House or adding another bedroom, Bates declined to do so.

44.     Having no other options from the College, Coach Hall agreed to accept the Ware Street House for his family's housing.

45.     In so doing, Coach Hall expected—and the College understood that Coach Hall bargained for—that he would be able to move into the Ware Street House immediately upon moving to Maine.

6

46.      On June 20, 2018, Coach Hall returned to Philadelphia to pack up his family and begin moving to Lewiston.

47.      To his surprise and disappointment, he received an e-mail from Donna Sevigny, Assistant to the Vice President for Campus Life and Dean of Students, indicating that he and his family would be required to stay in a hotel from at least and approximately June 22, 2018 through July 2, 2018.

48.      On June 24, 2018, Coach Hall informed Bates' Athletic Director ("AD") Jason Fein and Bates' Vice President for Campus Life and Dean of Students ("Vice President") Joshua McIntosh that his brother, Jamier Hall, would be arriving shortly to join the Bates' Football Support Staff as the team's Video Coordinator.

49.      During the interview process and after, Coach Hall had conveyed to Bates that once he was hired as the Bates' Head Football Coach, he would hire Jamier Hall as a member of his staff.

50.      Coach Hall was surprised and offended when AD Fein accused him of a lack of transparency, and for engaging in nepotism by hiring Jamier Hall.

51.      Prior to this conversation, Bates never informed Coach Hall of any policy that would prevent him from hiring Jamier Hall, as he had always intended to do and as he had relayed to Bates during the interview process and thereafter.

52.      Coach Hall hired Jamier Hall to film and edit video of the team's games and practices, something that Jamier Hall previously specialized in.

53.      What's more, Coach Hall knew that the team needed to have an in-house Video Coordinator in place as soon as possible because he had been hired so close to the start of the season.

54.     Coach Hall believed that because Jamier Hall had previously and successfully worked as a Special Needs Educator in the Detroit Public Schools Tech Department, he was the right hire as the team's Video Coordinator.

55.     AD Fein's reaction to Jamier Hall's prospective hiring proved that Bates had not bothered to read or understand Coach Hall's employment application before suggesting that he was unforthcoming or unethical.

56.     Although this was the first time that Bates accused Coach Hall of reticent or unethical behavior, it would not be the last.

57.     Indeed, it also would not be the first or last time that Bates levied unfounded or inaccurate claims against Coach Hall, suggesting wrongly that Coach Hall was guilty of a number of various wrongful and inappropriate conduct.

58.     Due to Bates' apparent refusal to read Coach Hall's employment application for the Head Football Coach position, and given the urgent need for the team to have a Video Coordinator, Coach Hall ultimately and begrudgingly agreed to retain Jamier Hall as a volunteer, rather than as a paid assistant.

59.     On June 21, 2018, Vice President McIntosh and Coach Hall had a phone conversation about Coach Hall's concerns regarding his housing situation.

60.     In that conversation, Vice President McIntosh assured Coach Hall that Bates was working to secure housing for Coach Hall's family as the Hall family continued to live in a hotel.

61.     The conversation ended with Coach Hall agreeing that the Ware Street House would be an acceptable place to live as long as work could be done to make it fit, healthy, and safe for his family to live there.

62.     Vice President McIntosh also assured and reassured Coach Hall that any work necessary for health and safety purposes, among others, would be done at Bates' expense.

63.     On July 27, 2018, Coach Hall and his family moved into the Ware Street House.

64.     On August 16, 2018, Coach Hall was faced with his second instance—within a short period of time after his hiring—of being incorrectly accused by Bates of terrible wrongdoing.

65.     Specifically, AD Fein confronted Coach Hall regarding an alleged audio recording of Coach Hall using an anti-gay slur while speaking to the Bates Football team.

66.     Coach Hall immediately and forcefully denied the accusations and asked to hear the alleged recording.

67.     Vice President Fein did not then—or at any later time—produce the alleged recording and, in fact, nobody associated with Bates ever spoke to Coach Hall about this accusation again.

68.     It is clear that, prior to leveling this allegation against Coach Hall, Bates did not conduct any investigation to determine whether Coach Hall had, in fact, used an offensive slur.

69.     On August 22, 2018, the Senior Associate Director of Athletics and Senior Woman Administrator for Bates ("SWA") Celine Cunningham, instructed Coach Hall to remove prayer from his practice schedule.

70.     SWA Cunningham contended that some players may feel it was mandatory and that Coach Hall had created a coercive environment for the team.

71.     It was clear that, prior to accusing Coach Hall of coercion, SWA Cunningham had not conducted any investigation into the manner in which prayer was incorporated into the Football team's practices and before games.

72.     Indeed, there has never been any indication that players felt coerced or offended by the way Coach Hall included optional prayer during practices and before games.

73.     Had SWA Cunningham conducted any investigation, she would have discovered there was nothing coercive or offensive about the manner in which Coach Hall included prayer as an optional team activity.

74.     That fact notwithstanding, in an effort to address SWA Cunningham's concerns and to avoid conflict with Bates, Coach Hall removed prayer from the practice schedule.

75.     Thereafter, in an attempt to incorporate prayer in a way with which Bates would be comfortable, Coach Hall suggested and requested that the Bates' multi-faith chaplain lead the team in optional prayer before games.

76.     Following several conversations with school administrators, Coach Hall was permitted to have the chaplain—who is white—to lead the team in prayer.

77.     It is clear the College initially prohibited prayer due to an assumption that Coach Hall—as a Black man—would lead prayer in a manner that the College considered culturally unacceptable because Bates ultimately allowed the kind of optional prayer for which Coach Hall had always advocated.

78.     In the days and weeks after Coach Hall and his family moved into the Ware Street House, it was obviously that the house needed significant work to make it an acceptable place to live from a habitability perspective, among others.

79.     The Ware Street House posed a significant health and safety risk to the Hall family.

80.     Specifically, Coach Hall learned that the College had previously—and unsuccessfully—attempted to remediate black mold in the house.

81.     At no time prior to Coach Hall's move did Bates inform him of the presence of black mold, or of its previous, unsuccessful attempts to remediate that mold.

82.     In August 2019, Coach Hall reported the myriad mold issue to Bates, and provided several photographs of its widespread infiltration in the home's basement.

10

83.     Coach Hall reported in good faith to Bates that it was illegal and a violation of federal and Maine law to knowingly place his family in a mold infested facility and that its failure to remediate the known and ongoing health and safety violations was a continuing violation.

84.     Coach Hall also notified Bates that he was scheduling medical appointments to determine whether the mold was affecting his health, his wife's health, and his children's health, while adding that he himself had contacted SERVPRO to evaluate the situation.

85.     To date, Coach Hall's three (3) children have experienced illness as a result of the home's black mold—including difficulty breathing and nose bleeds—and will continue to suffer effects from the black mold into the future.

86.     On September 13, 2019—the day before he was set to leave for a game—Coach Hall was called into have a meeting with Bates' Title IX Officer ("Title IX Officer") Gwen Lexow.

87.     During this meeting, Title IX Officer Lexow informed Coach Hall that he was being accused of sexual assault.

88.     However, Title IX Officer Lexow refused to tell Coach Hall who had accused him of sexual assault, the alleged nature of the sexual assault, or where or when it had allegedly occurred.

89.     Coach Hall was disturbed and distraught by this latest charge against him.

90.     Coach Hall could not understand why he was being accused or who could be doing the accusing.

91.     Coach Hall explained that as a Black Football Coach at a predominantly white school, any accusation of sexual impropriety on his part—even one as nebulous and unfounded as the one at issue—carried the likelihood of both ruining his career and placing a stigma on his family, friends, and the student–athletes that he coached.

11

92.     This was especially so, given the historical and present day difficulties for any Black person in securing a high level football coaching position, and in the context of the racist tropes built into the American consciousness that Black men are somehow prone to engaging in sexual assault, particularly against white women.

93.     Coach Hall has, in fact, always been scrupulous and hypervigilant in his behavior with students.

94.     This was, in part, because he is acutely aware that the National Football League has only one (1) Black head coach, even though approximately seventy percent (70%) of active players in the NFL are Black.

95.     Very simply, many of the players that have played for him look like him, but the inverse is not true: football across America remains controlled and coached by white men.

96.     This was also, in part, due to his awareness that Black men historically and now risk facing false allegations of sexual impropriety.

97.     Coach Hall was crushed that this nightmare had come true, and as he stood in the staircase hallways upon leaving Title IX Officer Lexow's office, he began crying.

98.     Coach Hall can count on one hand the number of times that he has cried in his life.

99.     Outside of the single conversation between Coach Hall and Title IX Officer Lexow, Bates has given Coach Hall no additional information regarding the steps, it took, if any to investigate and clear Coach Hall of the sexual assault allegations made on an unknown date by unknown woman at unknown location.

100.    On September 16, 2019, Coach Hall met with Bates' Vice President for Equity and Inclusion Dr. Noelle Chaddock.

101.    He and Dr. Chaddock discussed the racially charged accusations made against him and how he might—in light of everything that had occurred to date—be able to move forward at Bates in a productive manner.

102.    Coach Hall reported in good faith to Dr. Chaddock that the racial discrimination he was facing was unlawful and wrong.

103.    On September 30, 2019, the Bates' Football team's Offensive Coordinator, Custavious Patterson—who is also a Black man—told Coach Hall that campus security had recently tried to force their way into his house at 2 a.m., claiming they had received reports of a woman screaming from inside his house.

104.    Neither Coach Patterson nor Coach Hall has ever been presented by Bates or anyone else with evidence to support that claim.

105.    Coach Hall was shocked to learn of this additional unfounded and racially tinged implication of sexual assault.

106.    Coach Hall felt that these allegations reflected on his character as well, given that the incident and allegation was made against another member of his coaching staff so shortly after the racially charged allegation of sexual assault made directly against him.

107.    Coach Hall contacted Director of Campus Safety, Douglass Morency, about this incident.

108.    Mr. Morency–who also is a Black man–assured him that he would investigate the matter.

109.    Coach Hall was forced to explain to the Director of Campus Safety Morency how embarrassing and disturbing it was for this type of incident of occur, a fact that is particularly true in light of the previously mentioned and historically inarguable racist shibboleth of sexual violence committed by Black men.

13

110.     Coach Hall has never received any updates on the status of the investigation from Bates into this incident, or whether any such investigation ever occurred.

111.     Shortly after this incident, Mr. Morency separated from employment with Bates.

112.     On December 10, 2019, Title IX Officer Lexow informed Coach Patterson that he was accused of soliciting college students to have sex with football players whom he and Coach Hall had recruited to Bates.

113.     Neither Coach Patterson nor Coach Hall had any involvement in determining the students with whom recruits associated with while touring Bates.

114.     Coach Patterson and Coach Hall had involved the Office of Intercultural Education ("OIE") in recruiting efforts to ensure that when recruits who were Black and Indigenous People of Color ("BIPOC") toured the campus, they were assisted in those tours by BIPOC students.

115.     However, it was OIE—without the involvement of Coach Patterson or Coach Hall—that chose which students would conduct these tours.

116.     This process was under the control of Charlene Holmes, a Black woman.

117.     Like Mr. Morency before her, Ms. Holmes separated from employment at Bates shortly after these false and racially charged allegations of sexual impropriety were made against Coach Patterson and Coach Hall.

118.     The allegations against Coach Hall and Coach Patterson were and are untrue and drew upon centuries of negative tropes surrounding Black men and their attempts to exist in white communities.

119.     However, the ease with which Bates repeatedly allowed such racially-charged allegations to be made compelled and forced Coach Hall into a state of constantly defending himself layered over a new emotional state of pronounced anxiety, fear, and depression.

14

120.    No matter how unfounded these accusations were or how conclusively Coach Hall could disprove them, the negative impact upon his reputation by virtue of even one allegation being made—much less repeated allegations in short succession—is impossible to overstate or underscore.

121.    Thereafter, Coach Hall began to experience consistent and unexplained resistance from Bates in fulfilling his job responsibilities.

122.    For example, in the Summer of 2020, Coach Hall only had one (1) year remaining on his then-current contract.

123.    At his annual performance review on May 5, 2020, Coach Hall asked when negotiations would begin for a new contract.

124.    In response, Coach Hall was told that the timing of such negotiations needed to take into account the attention being devoted to the COVID-19 global pandemic.

125.    Coach Hall expressed his understanding of the difficulties posed by the pandemic, and was assured that discussions regarding his next contract would begin shortly.

126.    On May 7, 2020, Coach Hall requested what-should-have-been routine approval for a "Virtual Jr. Day Video," which is a tool used to recruit high school students.

127.    Despite several follow-up requests, Coach Hall never received such approval or any explanation as to why approval was not given.

128.    On May 8, 2020, in order to raise excitement and encourage donations to the Bates' Football program, Coach Hall requested approval for a fundraising information poster to send to football alumni.

129.    Despite making several requests for meetings, having approval meetings, and submitting yet more approval requests, Coach Hall never received a response to his request for approval of this poster.

130.    As a result, the poster was never distributed to alumni and Coach Hall was hampered in his ability to solicit donations towards fulfilling his job responsibilities.

131.    On February 4, 2021, Coach Hall contacted Bates to reiterate that his contract would be ending in June and that no discussions had yet occurred regarding a new contract.

132.    In response, Bates invited Coach Hall to a Zoom meeting on February 14, 2021, which Coach Hall understood would be on the subject of discussing a new contract.

133.    Instead, during the Zoom meeting, Bates rebuffed all of Coach Hall's attempts to discuss his contract.

134.    On April 4, 2021, Coach Hall had a follow-up Zoom meeting with administrators at Bates, again with the understanding that his contract situation would be the primary topic of discussion.

135.    At this meeting, Coach Hall expressed discomfort with the fact that his contract was set to expire in a matter of months, and no negotiations regarding a new contract had yet begun.

136.    Accordingly, despite his attempts to move discussions forward regarding a new contract, no progress was made at that meeting.

137.    On May 11, 2021, Coach Hall had another Zoom meeting with College administrators to discuss his soon-to-expire contract.

138.    In this meeting, Bates informed Coach Hall for the first time that there would be no contract negotiations.

139.    Bates further informed Coach Hall that his situation was different than anyone else's at Bates and that, as a result, its attorney(s) would need to review the matter before any further discussions could take place.

140.    In July 2021, Bates announced that Coach Hall would not be returning as its Head Football Coach for the 2021-2022 season.

## COUNT I
Maine Human Rights Act & Maine Whistleblowers' Protection Act: Whistleblower Retaliation

141.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

142.    Bates' conduct violate the Maine Whistleblowers' Protection Act as enforced through the Maine Human Rights Act, and Coach Hall has suffered damages as a result.

## COUNT II:
Maine Human Rights Act: Unlawful Racial Employment Discrimination

143.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

144.    Bates has subjected Coach Hall to unlawful race discrimination in violation of the Maine Human Rights Act, and Coach Hall has suffered damages as a result.

## COUNT III
Unlawful Racial Employment Practices – the Civil Rights Act of 1964, Title VII

145.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

146.    Bates has subjected Coach Hall to unlawful race discrimination in violation of Title VII of the Civil Rights Act of 1964, including but not limited to 42 U.S.C. § 2000e-2, and Coach Hall has suffered damages as a result.

## COUNT IV
Unlawful Racial Discrimination – Section 1981 of the Civil Rights Act of 1866

147.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

148.    Bates has subjected Coach Hall to unlawful race discrimination in violation of 42 U.S.C. § 1981 and other provisions of the Civil Rights Act of 1866, and Coach Hall has suffered damages as a result.

## COUNT V
## Defamation

149.   Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

150.   Bates intentionally and recklessly published false statements about Coach Hall.

151.   As a result of the publication of these false statements, Coach Hall has suffered and continues to suffer personal and professional injuries including the loss of new job opportunities and resulting income.

## COUNT VI
## Negligence as to Ayesha Hall

152.   Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

153.   Bates negligently failed to inform Coach Hall and his family that it had previously and unsuccessfully attempted to remediate black mold in the Ware Street House, and that the Ware Street House posed a health and safety risk.

154.   As a result of Bates' negligence, Ayesha Hall suffered and continues to suffer physical and emotional damages.

## COUNT VII
## Negligence as to Kayah Hall

155.   Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

156.   Bates negligently failed to inform Coach Hall and his family that it had previously and unsuccessfully attempted to remediate black mold in the Ware Street House, and that the Ware Street House posed a health and safety risk.

157.   As a result of Bates' negligence, minor Kayah Hall suffered and continues to suffer physical and emotional damages.

## COUNT VIII
## Negligence as to Malik Hall II

158.   Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

159.    Bates negligently failed to inform Coach Hall and his family that it had previously and unsuccessfully attempted to remediate black mold in the Ware Street House, and that the Ware Street House posed a health and safety risk.

160.    As a result of Bates' negligence, minor Malik Hall II suffered and continues to suffer physical and emotional damages.

COUNT IX
Negligence as to Asah Hall

161.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

162.    Bates negligently failed to inform Coach Hall and his family that it had previously and unsuccessfully attempted to remediate black mold in the Ware Street House, and that the Ware Street House posed a health and safety risk.

163.    As a result of Bates' negligence, minor Asah Hall suffered and continues to suffer physical and emotional damages.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

- Declare the conduct engaged in by Bates to be in violation of his rights;

- Enjoin the College, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

- Order Bates to employ him at his former position;

- Award equitable relief for back pay, benefits, and prejudgment interest;

- Award compensatory damages in an amount to be determined at trial;

- Award punitive damages in an amount to be determined at trial;

- Award civil penal damages in an amount to be determined at trial;

- Award nominal damages;

19

- Award attorney fees, including legal expenses and costs;

- Award prejudgment interest;

- Permanently enjoin Defendant from engaging in any employment practices that discriminate against persons on the basis of race;

- Require Defendant to mail a letter of all employees notifying them of the verdict against them and stating that Defendant will not tolerate race discrimination in the future;

- Require that Defendant post a notice in all of its workplaces of the verdict and a copy of this Court's order for injunctive relief;

- Require that Defendant train all management-level employees and members of the College on the protections afforded by Title VII of the Civil Rights Act of 1964, § 2000e, *et seq.*; the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551, *et seq.*; the Whistleblowers' Protection Act, 26 M.R.S. §§ 831 *et seq*, as enforced through the MHRA; and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981,

- Require that Defendant place a document in Plaintiff's personnel file explaining that it unlawfully discriminated against him; and

- Grant to Plaintiff such other and further relief as may be just and proper.

Dated at Portland, Maine this 7th day of April, 2022

/s/ Kelly M. Hoffman
Kelly M. Hoffman ~ Bar No. 4350
*Attorney for Plaintiff*

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME 04112-4600
(207) 774-7000
khoffman@nhdlaw.com

20