

**PLAINTIFF'S EXHIBIT**

D

## COMPLAINT OF DISCRIMINATION IN EMPLOYMENT
### MAINE HUMAN RIGHTS COMMISSION

I also want this filed with the U.S. Equal Employment Opportunity Commission (EEOC) ☒

I want this filed only with MHRC ☐

COMPLAINANT Name (indicate Mr., Ms., Mx.) *If more than 1, list under PARTICULARS below*

Malik Hall

Best Contact Phone #  ▓▓▓▓▓

Mailing Address, including city, state and ZIP code ▓▓▓▓▓

Email address: ▓▓▓▓▓

RESPONDENT(S)  [This is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me.] *If more than 2, list under PARTICULARS below.*

RESPONDENT #1 Name

Bates College

# Employees/Mem.  Over 500

Phone # (with Area Code)  207.791.1100

Mailing Address, including city, state and ZIP code
James R. Erwin, Esq.
254 Commercial Street, Portland, Maine 04101-4664

RECEIVED on JUN 21 2021 by Maine Human Rights Commission

RESPONDENT #2 Name

# Employees/Mem.

Phone # (with Area Code)

Mailing Address, including city, state and ZIP code

CAUSE OF DISCRIMINATION based on: (Check appropriate box(es))

☐ Age (D.O.B. ___/___/___)     ☒ Religion   ☒ Whistleblowers' Retaliation
☐ National Origin   ☐ Sex         ☐ MHRA Retaliation   ☐ Ancestry   ☐ Color
☐ Physical or Mental Disability   ☐ Workers' Compensation Retaliation
☐ Sexual Orientation   ☒ Race      ☐ Other (please specify): _____

DATE DISCRIMINATION TOOK PLACE

___/___/___   ___ongoing___
Earliest date    Latest date

CONTINUING ACTION?  __X__ If yes ☐

*(If additional paper is needed, attach extra sheet(s))*

### THE PARTICULARS ARE:

1. I am a Black American employed as Head Football Coach for Bates College ("Bates").

2. I played Division I football at the University of Massachusetts, where I played for three (3) years under Head Coach Mark Whipple and won an Atlantic 10 Championship.

3. I graduated from the University of Massachusetts with a Bachelor of Arts degree in Sociology and Education in 2003.

4. I have over seventeen (17) years of football coaching experience.

5. Prior to joining Bates, I was employed as football coach as follows:  Defensive Line Coach and Co-Special Teams Coordinator for Central Connecticut University from February 2004 through November 2005; Assistant Defensive Line coach for the National Football League Detroit Lions from July 2005 through August 2005; Defensive Line Coach and Co-Special Teams Coordinator for Fordham University from November 2005 through March 2006; Defensive Line Coach for Hofstra University from March 2006 through March 2009; Defensive Line Coach and Special Teams Coordinator for Fordham University from April 2009 through February 2010; Defensive Coordinator and Linebacker Coach for Wagner College from February 2010 through June 2011; Defensive Line Coach for the University of Massachusetts from June 2011 through December 2011; Defensive Coordinator and Linebacker Coach for Wagner College from February 2012 through February 2015; Defensive Line Coach for the University of Pennsylvania from February 2015 through July 2018; Head Football Coach for Bates from July 2018 through Present.

6. On June 13, 2018 I began the interview process to become the 20th Head Football Coach for Bates, and the first Black American Head Coach in Bates's history.

7. I knew that, if Bates hired me, Bates wanted me to quickly move from my Philadelphia, Pennsylvania home to Lewiston, Maine and begin my work as Head Football Coach.

8. Since my wife and three (3) young children would be moving with me, an utmost concern during my contract negotiations was receiving assurances that we would be able to view potential homes while negotiations continued and quickly move into acceptable permanent housing should negotiations be successful.

9. Despite receiving assurances that we would be able to look at potential housing during negotiations, that opportunity was never made available to me.

10. Bates offered me its Head Football Coach job shortly after my interview and I signed an offer letter agreeing to take the job on June 16, 2018.

11. My wife and I drove to Lewiston on June 18, 2018 to look at potential homes and the following day Bates showed us two (2) houses. The first was a former Bed & Breakfast located at 52 Ware Street in Lewiston that had sufficient space to accommodate my family, but required a significant amount of work. The second was located at 93 Bardwell Street. The Bardwell Street house was clearly too small to accommodate my family and when I asked whether it would be possible to

modify the house through finishing a basement or adding another bathroom such that it could accommodate my family's needs, I was simply told that it was not.

12. Although I expected that I would be able to move into permanent housing immediately upon my move to Maine, to my surprise, upon returning to Philadelphia on June 20, 2018 to pack up my family and begin moving to Lewiston, I received an e-mail from Donna Sevigny, Assistant to the Vice President for Campus Life and Dean of Students, indicating that my family and I would be staying in a hotel from at least June 22, 2018 through July 2, 2018.

13. On June 21, 2018, I received an e-mail from Joshua McIntosh, Vice President for Campus Life and Dean of Students, regarding scheduling a conversation to discuss my concerns about Bates's failure to ensure that suitable efforts were made to secure appropriate housing for my family from the start of my employment.

14. On June 24, 2018, I informed both Mr. Fein and Mr. McIntosh that my brother, Jamier Hall, would be arriving shortly. I had previously indicated in my engagement letter with the search firm that assisted me with securing my job with Bates that I intended to hire Jamier should I be hired as Head Football Coach. I was surprised, therefore, when Mr. Fein responded by accusing me of a lack of transparency with respect to the staff I intended to hire and that I was engaging in an inappropriate form of nepotism by hiring Jamier.

15. Jamier's role was critical in helping us film and edit our games and practice. Due to the late hire, I knew how critical it would be to be able to have an in house video coordinator. Jamier being a Special Needs Educator in Detroit Public Tech Department, I thought it would not only be a great hire for Jamier, but for Bates Football as well.

16. It was clear based on my interaction with Mr. Fein that either nobody associated with Bates had bothered to read the information I submitted with my application for the Head Football Coach position, or they had read it and decided to ignore it in favor of wrongfully accusing me of unethical behavior.

17. Although this was the first time I was wrongly accused of unethical behavior by those in positions of authority at Bates, it would not be the last time.

18. I eventually, with the consent of Bates's Human Resources department, brought in Jamier as a volunteer rather than as a paid assistant.

19. On June 21, 2018, Mr. McIntosh and I had a phone conversation about my concerns of housing which my 60 Days letter prompted. In that conversation, I was assured that Bates was working to secure housing for my family and me as it seemed we were going to have to spend the July 4th holiday in a hotel.

20. Mr. McIntosh and I decided that 52 Ware St. would fit my family more than enough, but my concern was the work that needed to be done. He assured me the work would be done, and that if I want to move from 52 Ware St. he would pay for my moving cost.

21. On July 18, 2018, I was notified by Heather Taylor of Bates's Human Resources department that the Ware Street property was move in ready for my family. Because of commitments associated with my father having passed away the week previous, my family was not able immediately to move in at that time, but did move in as soon as possible on July 27, 2018.

22. On August 16, 2018, Mr. Fein met with me to discuss an alleged audio recording of me saying the word "fag" or "faggot." I immediately and forcefully denied the accusation and asked to hear the alleged recording. Mr. Fein did not then, or at any subsequent time, produce the alleged recording and, in fact, never spoke to me about this accusation again.

23. On August 22, 2018, Celine Cunningham, Senior Associate Director of Athletics and Senior Woman Administrator for Bates spoke to me, after having reviewed my practice schedule, and instructed that I remove prayer from that schedule, saying that she believed some students would feel it is mandatory and be uncomfortable with that. I complied with Ms. Cunningham's suggestion and removed prayer from the practice schedule at that time.

24. In an attempt to work towards incorporating prayer in a way that all players and Bates administrators would be comfortable with, on October 3, 2018, I requested that the school's multi-faith chaplain be permitted to lead the players who wished to participate in prayer before the game. After significant discussion with my supervisors, including Mr. McIntosh, whose concerns, I was authorized to allow the chaplain to pray before the game and otherwise so long as it was made clear to the players that prayer is simply being offered for those who want it, and is in no way mandatory.

25. I was happy to comply with this suggestion as it was consistent with my intent all along.

26. Upon information and belief, the home that Bates College moved myself and my family into was colloquially referred to as the West Ware Inn.

27. Upon information and belief, approximately four (4) years prior Bates attempted to remediate - obviously unsuccessfully - the black mold that was present in the home in which my family was moved into by Bates.

28. At no point did Bates College inform my family or anyone associated with me that black mold existed in our home and that they had spent at least four (4) years on trying to remediate this health and safety issue.

29. On August 20, 2019, I e-mailed Mr. Swift, Mr. McIntosh, Mr. Fein, Ms. Taylor, and Robert Comeau, Bates's Rental Property Maintenance Manager, regarding the serious nature of the mold issue I believed to be at the Ware Street property including providing photographs of its extensive infiltration of the basement.

30. I also notified everyone that my wife and I were in the process of scheduling medical checkups regarding any health impacts on my children resulting from their long term exposure to this mold and that I had already contacted Servpro to evaluate the situation.

31. On September 13, 2019, Mr. Fein and Gwen Lexow, Bates's Title IX Officer called me into a meeting in Ms. Lexow's office before I was to leave with the team for our away game at Amherst.

32. In this meeting, Mr. Fein and Ms. Lexow told me that I had been accused of sexual assault.

33. Ms. Lexow, however, made clear that she could not tell me who had accused me of sexual assault, what the nature of the alleged sexual assault was, or where or when it had allegedly happened.

34. I was extremely disturbed by this revelation given that I could not even begin to imagine why I was being accused or who could be doing the accusing.

35. I explained that as a Black American Football Coach for a predominantly white institution like Bates, together with the historical and present day difficulties for any Black American in securing a high level football coaching position, and in the context of the racist trope built into the American consciousness that Black Americans are prone to engaging in sexual assault, particularly against white women, any accusation of sexual impropriety on my part carries the likelihood not only of ruining my career going forward, but placing a stigma on myself and my family that we will never be able to shake.

36. I have always been overly scrupulous in my behavior and deportment with students because I know that Black American men are always at high risk of having false allegations of the kind I was now faced with made against them.

37. I was crushed to have the nightmare I had always feared come true and cried in the staircase hallway as I left Ms. Lexow's office.

38. I can count on one hand the number of times that I have cried in my life.

39. On September 16, 2019, I had a meeting with Dr. Noelle Chaddock, Bates's Vice President for Equity and Inclusion, which we discussed my feelings regarding the racially charged accusation made against me and regarding how I might – if at all – be able to move forward at Bates in a productive manner in light of everything that had occurred to date.

40. On September 30, 2019, my offensive coordinator, Custavious Patterson, who is also a Black American, told me that campus security had attempted physically to force their way into his house at 2 A.M. recently, claiming that they had received reports of a girl screaming from his house.

41. Astonishingly, neither Mr. Patterson nor I has ever been presented with any evidence to support that claim.

42. I contacted Mr. Fein and Director of Campus Safety, Douglass Morency, about this incident and was assured the following day by Mr. Morency that he would investigate the matter and determine what had happened.

43. I explained to Mr. Morency how embarrassing and disturbing it would be to have an incident of this kind occur, a fact that is particularly true in light of the previously mentioned and historically inarguable racist trope of sexual violence committed by Black men.

44. To date, no resolution of this situation has occurred and I am unaware of whether any administrative record of the incident exists, or whether it is still the subject of any investigation. Coincidentally or not, Mr. Morency resigned shortly after this incident.

45. On December 10, 2019, Coach Patterson was summoned to a meeting with Ms. Lexow in which Ms. Lexow notified him that he stood accused of soliciting college students to have sex with football recruits who Coach Patterson and I had brought to Bates.

46. Neither Coach Patterson nor I had any involvement in determining which students that recruits associated with when touring Bates, but we had involved the Office of Intercultural Education ("O.I.E.") in our recruiting efforts in order to ensure that when recruits who are Black and Indigenous People of Color came to tour the campus, they were assisted in these tours by BIPOC students.

47. It was O.I.E., however, without the involvement of Coach Patterson or myself, who chose which specific students would conduct these tours.

48. Notably, this process was under the control of Charlene Holmes, a former O.I.E. employee who, coincidentally or not, resigned within weeks of this allegation being leveled against Coach Patterson and me.

49. The casualness and easiness with which the allegations continued to be made and relayed – again – constitutes a racially charged allegation of sexual misconduct against me.

50. On May 5, 2020, during my annual review, I asked about when we would begin the process of negotiating a new contract since my initial contract term was set to expire the following year.

51. I was told that timing of such negotiations needed to take into account the attention being devoted to the COVID-19 pandemic. I expressed my understanding of that fact, but was assured that we could begin discussions about my next contract soon.

52. To date, I am still waiting for discussions to begin regarding my contract.

53. Shortly after that meeting, I encountered mysterious resistance to what should have been simple requests for approval of proposed actions on my part.

54. For instance, on May 7, 2020, I requested approval for our "Virtual Jr. Day Video" from Mr. Fein. Despite several follow up e-mails on my part, I was never able to get such approval or even an explanation for why approval was not being given.

55. On May 8, 2020, I submitted a fundraising information poster to send to our football alumni to create excitement and encourage donations for specific football program needs.

56. Despite several meetings and approval requests, I never received a response to my request for approval and, therefore, the poster has never distributed.

57. On February 4, 2021, in an e-mail that also included information about recruitment and retention of football players for our program, I reminded him that my contract term was ending in June and that no discussions had yet occurred regarding a new contract.

58. I further e-mailed him with information about the work I had done for the program during my time at Bates.

59. He confirmed receipt of this information and to schedule a future meeting to, I thought, discuss what I had raised.

60. On February 14, 2021, I had a Zoom meeting with Mr. McIntosh and Mr. Fein that I understood to be for the purpose of following up on my repeated requests to discuss my contract situation. Instead, all my efforts to steer the conversation that way were redirected, with Mr. Fein eventually suggesting we end the meeting and schedule another one to discuss matters further.

61. On April 4, 2021, I had the follow up Zoom meeting with Mr. Fein that he previously suggested, this time also including Ms. Cunningham. Although I expressed my concerns and uneasiness with the fact that my contract was ending in two (2) months and yet negotiations on a new contract had yet to begin, no progress was made on this front during this meeting.

62. On May 11, 2021, I had yet another Zoom meeting with Mr. Fein and Ms. Cunningham in an attempt to discuss my contract negotiations.

63. In this meeting, Mr. Fein directly informed me for the first time that there would be no negotiations regarding my contract, that my contract is supposedly different from anyone else's at Bates, and that the school's lawyers needed to review it before he could discuss the matter further.

64. Bates's repeated actions in confronting me with baseless accusations of sexual misconduct together with similar actions taken against Coach Patterson, who is also a Black American, has left me with no other choice but to conclude that the various otherwise inexplicable offensive actions by Bates against me from the time I was first hired were taken on account of my race.

65. In particular, and in addition to the racially charged accusations of sexual misconduct to which I have been repeatedly subjected, Bates has accused me, without cause, of moral failings in my role as Head Football Coach, has failed and refused to ensure that my family and I are provided with a safe and healthy housing situation, and has made clear that my contract situation, as the first Black American Head Football Coach for Bates, is different from anyone else at Bates's contract situation to the point that I have been rebuffed in all attempts to discuss a contract extension and have been told that Bates's lawyers need to be involved in reviewing my contract in response to those attempts.

66. What's more, Bates has been the subject of several media bonanzas highlighting its systemic racial discrimination practices.

67. I personally know of several Black Americans who have experienced reprehensible instances of direct and obvious racial discrimination.

68. I have strived my entire career to become a college Head Football Coach and my experience with Bates has turned what should have been the realization of a dream into a nightmare that has negatively affected the physical and mental health of my family, and myself and seriously damaged my future career prospects.

69. Despite my overwhelming qualifications to have served, and continue to serve, as Head Football Coach at Bates, my significant contributions to the Bates football program and to Bates as an institution, and the positive reception I have received from my players, coaches, and those with whom I have interacted during my time at Bates, I have been denied equal treatment from how other Bates employees have been treated in the form of the utter refusal to engage with negotiations for the extension of my contract with Bates.

70. I believe that my case of race discrimination, race discrimination retaliation, religious discrimination, and whistleblower retaliation can be further supported and substantiated based on the conversations I have had with other similarly situated African Americans at Bates College.

71. Upon information and belief, I understand that Bates has settled other claims of racial discrimination made by similarly situated African Americans at Bates College.

By signing below, I* agree: (1) I will not make public any information that I learn through the investigation of this complaint until the MHRC's investigation is complete, and (2) I will not make public at all the names of any third persons that I learn during investigation of this Complaint; and (3) I will advise the EEOC and MHRC if I change my contact information, and I will cooperate fully with them in the processing of my complaint in accordance with their procedures; and (4) If this case relates to a disability I will complete and sign the medical authorization on the second page of this Complaint.  *The signature must be that of the Complainant. The signature of an attorney is not acceptable.

THE FOLLOWING SECTION MUST BE COMPLETED IN THE COMPANY OF A LICENSED MAINE NOTARY/ATTORNEY

I swear or affirm under penalty of perjury that the above complaint is true and correct to the best of my knowledge, information and belief.

Complainant signature: _____     Date: 6/2?/21

Notary/Attorney: Subscribed and sworn and subscribed before me, ___Molly Adams___, this 6/3?/21
                                                                    (Printed Name)

Signature of Notary Public/Attorney: __Molly Adams__     My Commission Expires: _____

MOLLY ADAMS
Notary Public, State of Maine
My Commission Expires 10/4/2026



NORMAN HANSON DeTROY

Kelly M. Hoffman, Esq.

Norman Hanson & DeTroy, LLC
Attorneys at Law
Two Canal Plaza
P.O. Box 4600
Portland, ME  04112-4600

T 207.774.7000
F 207.775.0806
www.nhdlaw.com
khoffman@nhdlaw.com

June 21, 2021

**Via USPS & E-Mail: amy.sneirson@mhrc.maine.gov**

Amy M. Sneirson, Executive Director
Maine Human Rights Commission
51 State House Station
Augusta, ME  04333-0051

Re:   Coach Malik Hall v. Bates College
       Our File No.   8502216.502216

Dear Executive Director Sneirson,

        Enclosed for filing in the above-referenced matter please find an original and a copy of the Complaint of Discrimination against Bates College.

        Please note my appearance on behalf of Coach Malik Hall, and direct all future communications regarding this file to my attention.  Thank you for your attention to this filing.

        Please contact me with questions.

                                    Very truly yours,

                                    Kelly M. Hoffman

KMH/mta
Enclosures
cc:  Brittany Munzing (*via email*)
       James R. Erwin, Esq. (*via email*)
       Coach Malik Hall (*via email*)

| COMPLAINT OF DISCRIMINATION IN EMPLOYMENT | I also want this filed with the U.S. Equal Employment Opportunity Commission (EEOC) ☒ |
|---|---|
| MAINE HUMAN RIGHTS COMMISSION | I want this filed only with MHRC ☐ |

**COMPLAINANT** Name (indicate Mr., Ms., Mx.) *If more than 1, list under PARTICULARS below*          Best Contact Phone #

Malik Hall          ▮▮▮▮▮▮▮

Mailing Address, including city, state and ZIP code          Email address: ▮▮▮▮▮▮▮

**RESPONDENT(S)** [This is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me.] *If more than 2, list under PARTICULARS below.*

| RESPONDENT #1 Name | # Employees/Mem. | Phone # (with Area Code) |
|---|---|---|
| Bates College | Over 500 | 207.791.1100 |

Mailing Address, including city, state and ZIP code
James R. Erwin, Esq.
254 Commercial Street, Portland, Maine 04101-4664

| RESPONDENT #2 Name | # Employees/Mem. | Phone # (with Area Code) |
|---|---|---|
| | | |

Mailing Address, including city, state and ZIP code

**CAUSE OF DISCRIMINATION** based on: [*Check appropriate box(es)*]

☐ Age [D.O.B. ___/___/___]     ☒ Religion  ☒ Whistleblowers' Retaliation
☐ National Origin   ☐ Sex      ☐ MHRA Retaliation  ☐ Ancestry  ☐ Color
☐ Physical or Mental Disability   ☐ Workers' Compensation Retaliation
☐ Sexual Orientation   ☒ Race     ☐ Other (please specify): _____

DATE DISCRIMINATION TOOK PLACE

___/___/___ Earliest date     ___ongoing___ Latest date

CONTINUING ACTION?  __X__ if yes

**THE PARTICULARS ARE:**          *(If additional paper is needed, attach extra sheet(s))*

1. I am a Black American employed as Head Football Coach for Bates College ("Bates").
2. I played Division I Football at the University of Massachusetts, where I played for three (3) years under Head Coach Mark Whipple and won an Atlantic 10 Championship.
3. I graduated from the University of Massachusetts with a Bachelor of Arts degree in Sociology and Education in 2003.
4. I have over seventeen (17) years of football coaching experience.
5. Prior to joining Bates, I was employed as a football coach as follows: Defensive Line Coach and Co-Special Teams Coordinator for Central Connecticut University from February 2004 through November 2005; Assistant Defensive Line coach for the National Football League Detroit Lions from July 2005 through August 2005; Defensive Line Coach and Co-Special Teams Coordinator for Fordham University from November 2005 through March 2006; Defensive Line Coach for Hofstra University from March 2006 through March 2009; Defensive Line Coach and Special Teams Coordinator for Fordham University from April 2009 through February 2010; Defensive Coordinator and Linebacker Coach for Wagner College from February 2010 through June 2011; Defensive Line Coach for the University of Massachusetts from June 2011 through December 2011; Defensive Coordinator and Linebacker Coach for Wagner College from February 2012 through February 2015; Defensive Line Coach for the University of Pennsylvania from February 2015 through July 2018; Head Football Coach for Bates from July 2018 through Present.
6. On June 13, 2018 I began the interview process to become the 20th Head Football Coach for Bates, and the first Black American Head Coach in Bates's history.
7. I knew that, if Bates hired me, Bates wanted me to quickly move from my Philadelphia, Pennsylvania home to Lewiston, Maine and begin my work as Head Football Coach.
8. Since my wife and three (3) young children would be moving with me, an utmost concern during my contract negotiations was receiving assurances that we would be able to view potential homes while negotiations continued and quickly move into acceptable permanent housing should negotiations be successful.
9. Despite receiving assurances that we would be able to look at potential housing during negotiations, that opportunity was never made available to me.
10. Bates offered me its Head Football Coach job shortly after my interview and I signed an offer letter agreeing to take that job on June 16, 2018.
11. My wife and I drove to Lewiston on June 18, 2018 to look at potential homes and the following day Bates showed us two (2) houses. The first was a former Bed & Breakfast located at 52 Ware Street in Lewiston that had sufficient space to accommodate my family, but required a significant amount of work. The second was located at 93 Bardwell Street. The Bardwell Street house was clearly too small to accommodate my family and when I asked whether it would be possible to

modify the house through finishing a basement or adding another bathroom such that it could accommodate my family's needs, I was simply told that it was not.

12. Although I expected that I would be able to move into permanent housing immediately upon my move to Maine, to my surprise, upon returning to Philadelphia on June 20, 2018 to pack up my family and begin moving to Lewiston, I received an e-mail from Donna Sevigny, Assistant to the Vice President for Campus Life and Dean of Students, indicating that my family and I would be staying in a hotel from at least June 22, 2018 through July 2, 2018.

13. On June 21, 2018, I received an e-mail from Joshua McIntosh, Vice President for Campus Life and Dean of Students, regarding scheduling a conversation to discuss my concerns about Bates's failure to ensure that suitable efforts were made to secure appropriate housing for my family from the start of my employment.

14. On June 24, 2018, I informed both Mr. Fein and Mr. McIntosh that my brother, Jamier Hall, would be arriving shortly. I had previously indicated in my engagement letter with the search firm that assisted me with securing my job with Bates that I intended to hire Jamier should I be hired as Head Football Coach. I was surprised, therefore, when Mr. Fein responded by accusing me of a lack of transparency with respect to the staff I intended to hire and that I was engaging in an inappropriate form of nepotism by hiring Jamier.

15. Jamier's role was critical in helping us film and edit our games and practice. Due to the late hire, I knew how critical it would be to be able to have an in house video coordinator. Jamier being a Special Needs Educator in Detroit Public Schools Tech Department, I thought it would not only be a great hire for Jamier, but for Bates Football as well.

16. It was clear based on my interaction with Mr. Fein that either nobody associated with Bates had bothered to read the information I submitted with my application for the Head Football Coach position, or they had read it and decided to ignore it in favor of wrongfully accusing me of unethical behavior.

17. Although this was the first time I was wrongly accused of unethical behavior by those in positions of authority at Bates, it would not be the last time.

18. I eventually, with the consent of Bates's Human Resources department, brought in Jamier as a volunteer rather than as a paid assistant.

19. On Jun 21, 2018, Mr. McIntosh and I had a phone conversation about my concerns of housing which my 60 Days letter prompted. In that conversation, I was assured that Bates was working to secure housing for my family and me as it seemed we were going to have to spend the July 4th holiday in a hotel.

20. Mr. McIntosh and I decided that 52 Ware St. would fit my family more than enough, but my concern was the work that needed to be done. He assured me the work would be done, and that if I want to move from 52 Ware St. he would pay my moving cost.

21. On July 18, 2018, I was notified by Heather Taylor of Bates's Human Resources department that the Ware Street property was move in ready for my family. Because of commitments associated with my father having passed away the week previous, my family was not able immediately to move in at that time, but did move in as soon as possible on July 27, 2018.

22. On August 16, 2018, Mr. Fein met with me to discuss an alleged audio recording of me saying the word "fag" or "faggot." I immediately and forcefully denied the accusation and asked to hear the alleged recording. Mr. Fein did not then, or at any subsequent time, produce the alleged recording and, in fact, never spoke to me about this accusation again.

23. On August 22, 2018, Celine Cunningham, Senior Associate Director of Athletics and Senior Woman Administrator for Bates spoke to me, after having reviewed my practice schedule, and instructed that I remove prayer from that schedule, saying that she believed some students would feel it is mandatory and be uncomfortable with that. I complied with Ms. Cunningham's suggestion and removed prayer from the practice schedule at that time.

24. In an attempt to work towards incorporating prayer in a way that all players and Bates administrators would be comfortable with, on October 3, 2018, I requested that the school's multi-faith chaplain be permitted to lead the players who wished to participate in prayer before the game. After significant discussion with my supervisors, including Mr. McIntosh, to ease concerns, I was authorized to allow the chaplain to pray before the game and otherwise so long as it was made clear to the players that prayer is simply being offered for those who want it, and is in no way mandatory.

25. I was happy to comply with this suggestion as it was consistent with my intent all along.

26. Upon information and belief, the home that Bates College moved myself and my family into was colloquially referred to as the West Ware Inn.

27. Upon information and belief, approximately four (4) years prior Bates attempted to remediate – obviously unsuccessfully – the black mold that was present in the home in which my family was moved into by Bates.

28. At no point did Bates College inform my family or anyone associated with me that black mold existed in our home and that they had spent at least four (4) years on trying to remediate this health and safety issue.

29. On August 20, 2019, I e-mailed Mr. Swift, Mr. McIntosh, Mr. Fein, Ms. Taylor, and Robert Comeau, Bates's Rental Property Maintenance Manager, regarding the serious nature of the mold issue I believed to be at the Ware Street property, including providing photographs of its extensive infiltration of the basement.

30. I also notified everyone that my wife and I were in the process of scheduling medical checkups regarding any health impacts on my children resulting from their long term exposure to this mold and that I had already contacted Servpro to evaluate the situation.

31. On September 13, 2019, Mr. Fein and Gwen Lexow, Bates's Title IX Officer called me into a meeting in Ms. Lexow's office before I was to leave with the team for our away game at Amherst.

32. In this meeting, Mr. Fein and Ms. Lexow told me that I had been accused of sexual assault.

33. Ms. Lexow, however, made clear that she could not tell me who had accused me of sexual assault, what the nature of the alleged sexual assault was, or where or when it had allegedly happened.

34. I was extremely disturbed by this revelation given that I could not even begin to imagine why I was being accused or who could be doing the accusing.

35. I explained that as a Black American Football Coach for a predominantly white institution like Bates, together with the historical and present day difficulties for any Black American in securing a high level football coaching position, and in the context of the racist trope built into the American consciousness that Black Americans are prone to engaging in sexual assault, particularly against white women, any accusation of sexual impropriety on my part carries the likelihood not only of ruining my career going forward, but placing a stigma on myself and my family that we will never be able to shake.

36. I have always been overly scrupulous in my behavior and deportment with students because I know that Black American men are always at high risk of having false allegations of the kind I was now faced with made against them.

37. I was crushed to have the nightmare I had always feared come true and cried in the staircase hallway as I left Ms. Lexow's office.

38. I can count on one hand the number of times that I have cried in my life.

39. On September 16, 2019, I had a meeting with Dr. Noelle Chaddock, Bates's Vice President for Equity and Inclusion, in which we discussed my feelings regarding the racially charged accusation made against me and regarding how I might – if at all – be able to move forward at Bates in a productive manner in light of everything that had occurred to date.

40. On September 30, 2019, my offensive coordinator, Custavious Patterson, who is also a Black American, told me that campus security had attempted physically to force their way into his house at 2 A.M. recently, claiming that they had received reports of a girl screaming from his house.

41. Astonishingly, neither Mr. Patterson nor I has ever been presented with any evidence to support that claim.

42. I contacted Mr. Fein and Director of Campus Safety, Douglass Morency, about this incident and was assured the following day by Mr. Morency that he would investigate the matter and determine what had happened.

43. I explained to Mr. Morency how embarrassing and disturbing it would be to have an incident of this kind occur, a fact that is particularly true in light of the previously mentioned and historically inarguable racist trope of sexual violence committed by Black men.

44. To date, no resolution of this situation has occurred and I am unaware of whether any administrative record of the incident exists, or whether it is still the subject of any investigation. Coincidentally or not, Mr. Morency resigned shortly after the incident.

45. On December 10, 2019, Coach Patterson was summoned to a meeting with Ms. Lexow in which Ms. Lexow notified him that he stood accused of soliciting college students to have sex with football recruits who Coach Patterson and I had brought to Bates.

46. Neither Coach Patterson nor I had any involvement in determining which students that recruits associated with when touring Bates, but we had involved the Office of Intercultural Education ("O.I.E.") in our recruiting efforts in order to ensure that when recruits who are Black and Indigenous People of Color came to tour the campus, they were assisted in those tours by BIPOC students.

47. It was O.I.E., however, without the involvement of Coach Patterson or myself, who chose which specific students would conduct these tours.

48. Notably, this process was under the control of Charlene Holmes, a former O.I.E. employee who, coincidentally or not, resigned within weeks of this allegation being leveled against Coach Patterson and me.

49. The casualness and easiness with which the allegations continued to be made and relayed – again – constitutes a false and racially charged allegation of sexual misconduct against me.

50. On May 5, 2020, during my annual review, I asked about when we would begin the process of negotiating a new contract, since my initial contract term was set to expire the following year.

51. I was told that timing of such negotiations needed to take into account the attention being devoted to the COVID-19 pandemic. I expressed my understanding of that fact, but was assured that we could begin discussions about my next contract soon.

52. To date, I am still waiting for discussions to begin regarding my contract.

53. Shortly after that meeting, I encountered mysterious resistance to what should have been simple requests for approval or proposed actions on my part.

54. For instance, on May 7, 2020, I requested approval for our "Virtual Jr. Day Video" from Mr. Fein. Despite several follow up e-mails on my part, I was never able to get such approval or even an explanation for why approval was not being given.

55. On May 8, 2020, I submitted a fundraising information poster to send to our football alumni to create excitement and encourage donations for specific football program needs.

56. Despite several meetings and approval requests, I never received a response to my request for approval and, therefore, the poster has never distributed.

57. On February 4, 2021, in an e-mail that also included information about recruitment and retention of football players for our program, I reminded him that my contract term was ending in June and that no discussions had yet occurred regarding a new contract.

58. I further e-mailed him with information about the work I had done for the program during my time at Bates.

59. He confirmed receipt of this information and to schedule a future meeting to, I thought, discuss what I had raised.

60. On February 14, 2021, I had a Zoom meeting with Mr. McIntosh and Mr. Fein that I understood to be for the purpose of following up on my repeated requests to discuss my contract situation. Instead, all my efforts to steer the conversation that way were redirected, with Mr. Fein eventually suggesting we end the meeting and schedule another one to discuss matters further.

61. On April 4, 2021, I had the follow up Zoom meeting with Mr. Fein that he previously suggested, this time also including Ms. Cunningham. Although I expressed my concerns and uneasiness with the fact that my contract was ending in two (2) months and yet negotiations on a new contract had yet to begin, no progress was made on this front during this meeting.

62. On May 11, 2021, I had yet another Zoom meeting with Mr. Fein and Ms. Cunningham in an attempt to discuss my contract negotiations.

63. In this meeting, Mr. Fein directly informed me for the first time that there would be no negotiations regarding my contract, that my contract is supposedly different from anyone else's at Bates, and that the school's lawyers needed to review it before he could discuss the matter further.

64. Bates's repeated actions in confronting me with baseless accusations of sexual misconduct together with similar actions taken against Coach Patterson, who is also a Black American, has left me with no other choice but to conclude that the various otherwise inexplicable offensive actions by Bates against me from the time I was first hired were taken on account of my race.

65. In particular, and in addition to the racially charged accusations of sexual misconduct to which I have been repeatedly subjected, Bates has accused me, without cause, of moral failings in my role as Head Football Coach, has failed and refused to ensure that my family and I are provided with a safe and healthy housing situation, and has made clear that my contract situation, as the first Black American Head Football Coach for Bates, is different from anyone else at Bates's contract situation to the point that I have been rebuffed in all attempts to discuss a contract extension and have been told that Bates's lawyers need to be involved in reviewing my contract in response to those attempts.

66. What's more, Bates has been the subject of several media bonanzas highlighting its systemic racial discrimination practices.

67. I personally know of several Black Americans who have experienced reprehensible instances of direct and obvious racial discrimination.

68. I have strived my entire career to become a college Head Football Coach and my experience with Bates has turned what should have been the realization of a dream into a nightmare that has negatively affected the physical and mental health of my family, and myself and seriously damaged my future career prospects.

69. Despite my overwhelming qualifications to have served, and continue to serve, as Head Football Coach at Bates, my significant contributions to the Bates football program and to Bates as an institution, and the positive reception I have received from my players, coaches, and those with whom I have interacted during my time at Bates, I have been denied equal treatment from how other Bates employees have been treated in the form of the utter refusal to engage with negotiations for the extension of my contract with Bates.

70. I believe that my case of race discrimination, race discrimination retaliation, religious discrimination, and whistleblower retaliation can be further supported and substantiated based on the conversations I have had with other similarly situated African Americans at Bates College.

71. Upon information and belief, I understand that Bates has settled other claims of racial discrimination made by similarly situated African Americans at Bates College.

By signing below, I* agree: (1) I will not make public any information that I learn through the investigation of this complaint until the MHRC's investigation is complete, and (2) I will not make public at all the names of any third persons that I learn during investigation of this Complaint; and (3) I will advise the EEOC and MHRC if I change my contact information, and I will cooperate fully with them in the processing of my complaint in accordance with their procedures; and (4) if this case relates to a disability I will complete and sign the medical authorization on the second page of this Complaint. *The signature must be that of the Complainant. The signature of an attorney is not acceptable.

*!THE FOLLOWING SECTION MUST BE COMPLETED IN THE COMPANY OF A LICENSED MAINE NOTARY/ATTORNEY!*

I swear or affirm under penalty of perjury that the above complaint is true and correct to the best of my knowledge, information and belief.

Complainant signature: _____   Date: 6/2/21

Notary/Attorney: Subscribed and sworn and subscribed before me. _____ Molly Adams _____, this 6/3/21
                                                                        (Printed Name)

Signature of Notary Public/Attorney: _Molly Adams_   My Commission Expires: _____

**MOLLY ADAMS**
Notary Public, State of Maine
My Commission Expires 10/4/2026