**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| MALIK HALL AND AYESHA HALL, individually and p/n/f/o minors ASAH HALL, KAYAH HALL, AND MALIK HALL II,<br><br>    Plaintiffs<br><br>    v.<br><br>PRESIDENT AND TRUSTEES OF BATES COLLEGE,<br><br>    Defendant | Case No. 2:22-cv-0090-JAW |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**<u>INTRODUCTION</u>**

Plaintiffs Malik Hall ("Coach Hall") and Ayesha Hall, individually and p/n/f/o their children Asah Hall, Kaya Hall, and Malik Hall II (collectively, "Plaintiffs") hereby oppose Defendant President and Trustees of Bates College's ("Bates") motion seeking the dismissal of all claims asserted under the Complaint.  In short, Bates's motion is an exercise in missing the point and attempting to elevate the requirements of notice pleading under the Federal Rules of Civil Procedure beyond their proper role of ensuring that a defendant understands the nature of the claims being made against it.

The Complaint provides a thorough and detailed account of the manner in which Coach Hall was subjected to intolerable treatment by Bates, including repeatedly having allegations levied against him that drew upon the worst racial stereotypes that Black Americans have long been forced to endure, and a refusal to negotiate a potential extension of Coach Hall's contract

1

under the same conditions that applied to every other, predominantly White, employee of Bates. All of this ultimately resulted in Coach Hall being forced to seek new employment. It defies common sense and applicable law, therefore, for Bates to argue that the Complaint fails to sufficiently place it on notice of the nature of Coach Hall's claims arising primarily out of the racially discriminatory treatment to which he was subjected. For that reason, as well as those described in detail below, Bates's motion to dismiss should be denied.

## FACTUAL ALLEGATIONS

Coach Hall is a highly decorated and experienced football coach who began the interview process with Bates in June of 2018 to become the first Black Head Coach in Bates's history. (ECF No. 1 at Introduction, ¶¶ 15-31, PageID ## 1-5.) During the interview process, Coach Hall was clear that an important factor in his decision whether to accept the Bates job was Bates's representation to him that it would quickly ensure the availability of housing appropriate to house him, his wife, and their three minor children. (ECF No. 1 ¶¶ 2-4, 33-35, PageID ## 3, 5-6.) With assurances from Bates that his housing situation would be appropriately addressed, Coach Hall signed a contract to take the Bates Head Football Coach position on June 16, 2018. (ECF No. 1 ¶¶ 34-37, PageID ## 5-6.) From that point forward, Coach Hall experienced a continuous stream of Bates subjecting him to intolerable treatment for any employee, much less one as prominent as the first Black Head Coach in Bates's history.

**A.   The Only Sufficiently Sized Housing Option Offered to Coach Hall Was Infested With Black Mold.**

Ultimately, the only housing option offered by Bates to Coach Hall that was large enough to accommodate his family was a former Bed & Breakfast located at 52 Ware Street in Lewiston (the "Ware Street House"). (ECF No. 1 ¶¶ 35-43, PageID # 6.) Coach Hall came to learn, however, that the Ware Street House was neither prepared to accept his family upon their arrival

in Maine, necessitating a lengthy hotel stay for the entire family, nor was that house a healthful and appropriate residence for anyone in the condition it was in at the time Plaintiffs were called upon to reside there, much less for a family with minor children.  (ECF No. 1 ¶¶ 47, 78-81, PageID ## 7, 10.)  Specifically, well after moving into the Ware Street House, Coach Hall learned that, among other issues, Bates was aware that the house was infested with black mold and that it had been unsuccessful in earlier attempts to remediate that black mold.  (ECF No. 1 ¶¶ 78-81, PageID #10.)  None of this was disclosed to Coach Hall before moving into the Ware Street House.  (ECF No. 1 ¶ 81, PageID # 10.)

Coach Hall had been explicitly assured by Bates prior to moving his family into the Ware Street House on June 21, 2018 that all work necessary to make the house safe for Coach Hall's family to live in would be done at Bates's expense. (ECF No. 1 ¶¶ 59-63, PageID ## 8-9.)  This obviously did not occur given Bates's knowledge of the unsuccessful mold remediation efforts followed by no subsequent efforts being made to address this issue until after Coach Hall made Bates aware of his knowledge with respect to the mold infestation.

Although Bates was already aware of the existence of mold in the Ware Street House, in August 2019, Coach Hall told Bates that he had become aware of the significant extent to which mold had infiltrated the basement in particular.  (ECF No. 1 ¶ 82, PageID # 10.)  Coach Hall made clear that he believed Bates to be violating federal and state law by knowingly placing his family in a mold-infested residence and that he would be taking his family to medical professionals to assess the impact this had on their health.  (ECF No. 1 ¶¶ 82-83, PageID # 11.)  In fact, Coach Hall's three children have experienced difficulty breathing, nose bleeds, and other continuing negative health effects as a direct result of being exposed to the Ware Street House's black mold infestation.  (ECF No. 1 ¶ 85, PageID # 11.)

**B.    Bates Accuses Coach Hall of Violation of its Nepotism Policy Despite Foreknowledge of Coach Hall's Intention to Hire His Brother.**

Even before he was hired, during the interview process Coach Hall was clear with Bates that he intended to hire his brother, Jamier Hall ("Jamier"), as a member of his coaching staff. (ECF No. 1 ¶¶ 48-49, PageID # 7.)  The timing of Coach Hall's prospective hiring was such that he knew that the team would need to very quickly have an in-house Video Coordinator in place, which was a position that Jamier was well qualified to fill.  (ECF No. 1 ¶¶ 54-54, PageID ## 7-8.)  Although Bates was fully aware of this plan from the start, nobody at Bates raised an issue about it prior to Coach Hall's hiring.  (ECF No. 1 ¶ 51, PageID # 7.)  Coach Hall was shocked, therefore, to be confronted on June 24, 2018 by Bates's Athletic Director with accusations of lack of transparency and nepotism that implicated Coach Hall's ethical standing after his hiring of Jamier.  (ECF No. 1 ¶¶ 50-52, Page ID # 7.)   This was the first time, but it would be far from the last, that Bates would level accusations of unethical conduct at Coach Hall without any basis in fact.  (ECF No. 1 ¶¶ 55-57, PageID # 8.)

**C.    Coach Hall is Accused Without Factual Support of Using a Bigoted Slur.**

Not long after Bates brought Coach Hall's integrity into question by accusing him, without basis, of a lack of transparency regarding his intention to hire Jamier, on August 16, 2018 Bates further impugned Coach Hall's integrity without basis when it represented that it had an audio recording of Coach Hall using an anti-gay slur while speaking to his team.  (ECF 1 ¶¶ 64-65, PageID # 9.)  Coach Hall denied that anything like this ever occurred and demanded to hear the alleged tape.  (ECF 1 ¶¶ 66, PageID # 9.)  Nobody spoke to Coach Hall prior to leveling this accusation, no apparent investigation was ever conducted otherwise into the truth of the allegation, and no tape recording of Coach Hall using a racial slur has ever been produced.  (ECF No. 1 ¶¶ 67-68, PageID # 9.)  From this, it is a fair inference that Bates manufactured the

allegation or that it had no interest its truth.  (ECF No. 1 ¶ 68, PageID # 9.)

**D.      Coach Hall is Accused Without Factual Support of Religious Coercion.**

The next incident in which Bates, without any basis in fact, accused Coach Hall of acting in a manner that impugned his integrity happened the following week when, on August 22, 2018, Bates instructed Coach Hall to remove prayer from his practice schedule under the alleged rationale that his players would feel coerced into participating in religious activities to which they objected.  (ECF No. 1 ¶¶ 69-70, PageID # 9.)  As with the allegation of Coach Hall leveling an anti-gay slur, there is no evidence supporting this allegation.

The truth is that Coach Hall had included the opportunity for prayer as an optional team building activity, that there is no evidence that any player felt coerced into participating, and that even the most rudimentary investigation on Bates's part prior to leveling its accusation against Coach Hall would have revealed these facts.  (ECF No. 1 ¶¶ 71-73, PageID ## 9-10.)  Again, the reasonable inference from the manner in which this allegation was made is that Bates had no interest in the truth and simply assumed that Coach Hall, as a Black man, was unable to incorporate prayer into his practices in a way that Bates would consider acceptable.  (ECF No. 1 ¶¶ 74-77, PageID # 10.)  This conclusion is only reinforced by the fact that Bates did eventually allow prayer to be incorporated in Coach Hall's practices, so long as they were led by Bates's white chaplain.  (*Id.*)

**E.      Coach Hall is Accused Without Factual Support of Sexual Assault.**

On September 13, 2019, Bates again leveled an unfounded allegation against Coach Hall that not only impugned Coach Hall's integrity, but accused him of a criminal act.  In particular, Bates confronted Coach Hall with an accusation of sexual assault.  (ECF No. 1 ¶¶ 86-87, PageID # 11.)  In so doing, Bates refused to identify any details about the accusation, including who had

accused him, what actions allegedly constituted the sexual assault he was being accused of, or the location and timing of the alleged assault.  (ECF No. 1 ¶ 88, Page ID # 11.)  Like each of the prior allegations against him, Coach Hall was confounded and disturbed by why he was being falsely accused on the basis of no evidence.  (ECF No. 1 ¶¶ 89-90, PageID # 11.)  In this specific case, however, the allegation was particularly disturbing to Coach Hall, and dangerous for his career, given the way in which it trafficked in the worst historical stereotypes to which Black American men have been subjected for centuries.  (ECF No. 1 ¶ 91, PageID # 11.)

It is well established that there is a racist trope that Black men are prone to engaging in sexual assault of white women, leading Coach Hall to be hypervigilant about his behavior with students throughout his career, and in particular at the predominantly White Bates.  (ECF No. 1 ¶¶ 91-93, 96, PageID ## 11-12.)  With the likelihood that an allegation of this kind could crush his hopes of career advancement, it is startling that Bates would levy such an accusation at Coach Hall without any substantiation.  (ECF No. 1 ¶¶ 91, 99, PageID ## 11-12.)  It is, however, not entirely aberrational given Bates's history of institutional racism.  (ECF No. 1 at footnote 1, Exhibits A-C; PageID ## 1, 21-49.)

Similar to the earlier allegation that Coach Hall had used a homophobic slur, Bates has been unable or unwilling to disclose who is the source of the allegation, when or where the alleged incident occurred, or any additional information whatsoever regarding steps that Bates took, either prior to or after accusing Coach Hall, to determine the truth of the allegations.  (ECF No. 1 ¶ 99, PageID # 12.)  Again, it is a reasonable inference from this behavior that Bates either has no support for the allegation levied, or is uninterested in whether there is any truth to allegations made against Coach Hall.[1]

---

[1] Bates argues that all of these allegations were made in good faith by third-parties, not by Bates itself, and that various rules are what prohibited them from disclosing any facts to Coach Hall.  The truth of the

Importantly, Coach Hall was clear contemporaneously in discussions with Bates's Vice President for Equity and Inclusion that he considered all of the incidents to date that involved the impugning of his integrity and reputation to be examples of racially charged accusations that constituted racial discrimination. (ECF No. 1 ¶¶ 100-102, PageID ## 12-13.) Given the nature of certain arguments articulated in Bates's motion brief, it bears being explicit that it is necessarily true that if these incidents constituted racial discrimination, they are examples of Coach Hall being treated differently from White employees at Bates.

**F.   Coach Hall's Offensive Coordinator is Also Accused Without Factual Support of Sexual Assault.**

Shortly after the above described incident, on September 30, 2019 Coach Hall's Offensive Coordinator, Custavous Patterson, who is also a Black man, was subjected to Bates campus security attempting to force their way into his home in the middle of the night claiming that they had heard a woman screaming from inside his house. (ECF No. 1 ¶ 103, PageID # 13.) Coach Hall, reasonably, believed both that these allegations against his coach reflected directly on him and that they were connected with the sexual assault allegations that had just recently been made against him by Bates as part of an apparent racially motivated campaign. (ECF No. 1 ¶ 106, PageID # 13.) Just as with all the earlier racially charged allegations described above, there was not only no truth to the allegations, but there was no evidence whatsoever to support them. (ECF No. 1 ¶¶ 104-106, PageID # 13.)

To further add fuel to the suspicion that Bates either has manufactured the above described incidents or, at minimum, has no interest in determining their truth for racially discriminatory reasons, Coach Hall discussed the incident involving Coach Patterson with

---

facts underlying these arguments are something that can only be determined, however, in the context of sworn testimony and compelled document production, not something that Court may infer is true from bare assertions made in a pleading responsive to Plaintiffs' Complaint.

Bates's Director of Campus Safety, Douglass Morency, who is also a Black man.  (ECF No. 1 ¶¶ 107-108, PageID # 13.)  Shortly after Mr. Morency assured Coach Patterson that the matter would be investigated, Mr. Morency's employment with Bates terminated.  (ECF No. 1 ¶¶ 108-111, PageID ## 13-14.)  Thereafter, Coach Hall has received no information indicating that an investigation into how the wrongful allegation against Coach Patterson came about ever took place.  (ECF No. 1 ¶ 110, PageID # 14.)

**G.    Coach Hall and Coach Patterson Are Accused Without Support of Soliciting Bates Students to have Sex With BIPOC Football Recruits.**

The next in the continuing litany of racially charged allegations levied against Coach Hall occurred less than two months later when Coach Hall was informed by Bates that he and Coach Patterson stood accused of the outrageous action of soliciting Bates students to have sex with football recruits who were on campus to tour Bates as part of their college selection process.  (ECF No. 1 ¶ 112, PageID # 14.)  The truth of the matter is that Coach Hall and Coach Patterson had gotten Bates's Office of Intercultural Education ("OIE") involved in the team's recruiting efforts in order to ensure than when Black and Indigenous People of Color ("BIPOC") prospective students who Coach Hall was recruiting toured Bates, the tour was conducted by BIPOC Bates students.  (ECF No. 1 ¶ 114, PageID # 14.)  Neither coach, however, had anything to do with determining which students recruits associated with while at Bates or how those students interacted with the recruits, much less solicited such students to have sex with the recruits.  (ECF No. 1 ¶¶ 113-115, PageID # 14.)

The process of investigating this latest allegation of sexual impropriety against Coach Hall, like the previous allegation, was initially under the control of a Black individual, in this case Charlene Holmes.  (ECF No. 1 ¶ 116, PageID # 14.)  Suspiciously, just like Mr. Morency, Ms. Holmes's employment with Bates was terminated shortly after she became involved with

investigating such allegations.  (ECF No. 1 ¶ 117, PageID # 14.)

**H.     Bates Created a Hostile Work Environment for Coach Hall.**

All of the above false allegations impugning Coach Hall's integrity created an

increasingly hostile work environment in which Coach Hall was expected to do his job.  This

was particularly true of the allegations against Coach Hall, and his assistant coach, alleging

sexual improprieties against them that drew upon centuries of negative tropes surrounding Black

men and, specifically, Black men interacting with predominantly white communities.  (ECF No.

1 at Introduction, ¶ 118, PageID # 14.)  The fact that Bates found it so easy to levy such racially

charged allegations against Coach Hall without any factual support forced Coach Hall into the

position of constantly needing to defend himself against some of the worst allegations

imaginable for a man in his position.  (ECF No. 1 ¶ 119, PageID # 14.)

Moreover, regardless of how unfounded the accusations against Coach Hall were, or how

conclusively Coach Hall could disprove them, the fact remains that the negative impact upon

Coach Hall's reputation from even one, much less multiple in short succession, allegations of the

kind Bates issued against Coach Hall is profound.  (ECF No. 1 ¶ 120, PageID # 15.)  The

objectively foreseeable result of this state of affairs, and the subjectively manifested reality of the

situation, is that Coach Hall was left in a pervasive state of pronounced anxiety, fear, and

depression by Bates's actions.  (ECF No. 1 ¶ 119, PageID # 14.)

**I.     Bates Refuses to Negotiate Extending Coach Hall's Contract.**

In the aftermath of all of the above, Coach Hall was placed in the position, in the Summer

of 2020, of facing uncertainty over his future that was substantially increased by the fact that he

only had one year remaining on his contract with Bates at that time. (ECF No. 1 ¶ 122, PageID #

15.)  At his annual performance review on May 5, 2020, Coach Hall inquired as to when

negotiations over a new contract would begin, to which he was told that, although the COVID-19 pandemic impacted the timing, such discussions would happen shortly.  (ECF No. 1 ¶¶ 122-125, PageID # 15.)  Despite these assurances, Bates did not address Coach Hall's contract in any way over the next ten months, at which point, with his contract set to expire in June, on February 4, 2021, Coach Hall again contacted Bates about discussing extending his contract.  (ECF No. 1 ¶ 131, PageID # 16.)  Bates responded by scheduling a Zoom meeting on February 14, 2021, purportedly to discuss this issue, but instead Bates refused any attempt to discuss Coach Hall's contract situation when the meeting occurred.  (ECF No. 1 ¶¶ 132-133, PageID # 16.)

There was a follow up Zoom meeting between Coach Hall and Bates administrators scheduled for April 4, 2021, again with the assurance by Bates that Coach Hall's contract would be the primary topic of discussion, but again Bates refused any attempt to make progress on such discussions when this meeting took place.  (ECF No. 1 ¶¶ 134-136, PageID # 16.)  On May 11, 2021, with mere weeks to go before his contract was set to expire and Bates having refused to engage in any substantive discussions to that point regarding an extension, Coach Hall had another Zoom meeting with Bates administrators in an attempt to discuss his contract.  (ECF No. 1 ¶ 137, PageID # 16.)  At this meeting, Coach Hall was told for the first time, and in unequivocal terms, that there would be no contract negotiations, despite the many assurances and indications he had previously received to the contrary.  (ECF No. 1 ¶ 138, PageID # 16.)

For unspecified reasons, but for reasons that are clearly enough inferred from the fact that Coach Hall was the first Black Head Coach at Bates, the administrators told Coach Hall that his situation was "different" from anyone else's at Bates and, as a result, it would purportedly need to have its attorneys involved before any contract discussions could take place.  (ECF No. 1 ¶¶ 138-139, PageID # 16.)  Shortly thereafter, in July 2021, Bates announced that Coach Hall would

no longer be employed as its football coach.  (ECF No. 1 ¶ 140, PageID # 17.)

**J.      Procedural Background.**

On April 7, 2022, Plaintiffs filed the Complaint initiating this action.  Therein, Plaintiffs asserted claims arising under the Maine Human Rights Act ("MHRA") for Whistleblower Retaliation, under the MHRA, Title VII of the Civil Rights Act of 1964, and under Section 1981 of the Civil Rights Act of 1866 for Unlawful Racial Discrimination, and for common law defamation, all with respect to Bates's discriminatory conduct towards Coach Hall.  (ECF No. 1 ¶¶ 141-151, PageID ## 17-18.)  Plaintiffs also asserted causes of action on behalf of Coach Hall's family related to the harm caused by Bates's negligence in failing to make known to Plaintiffs what it knew of the existence of black mold in the Ware Street house at the time they moved in.  (ECF No. 1 ¶¶ 152-163, PageID ## 18-19.)  Each of these Counts of the Complaint incorporated by reference each and every preceding allegation made in the Complaint including, without limitation, those described in detail above.  (ECF No. 1 ¶¶ 141, 143, 145, 147, 147, 152, 155, 158, 161, Page ID ## 17-19.)

Bates's motion to dismiss was filed on May 17, 2022.[2]  Through its motion, Bates essentially seeks to take each allegation of the Complaint completely out of the context of the rest of the allegations, have the Court make the most unfavorable inferences in light of those decontexualitzed allegations, and order dismissal based thereupon.  Viewed properly, the Complaint articulates a clear story of repeated racially motivated actions taken by Bates against Coach Hall that resulted in him needing to seek new employment.  On that basis, and those argued in detail below, Bates's motion should be denied.

---

[2] Although styled as a "Motion to Dismiss Counts IV-IX," Bates's motion actually seeks the dismissal of all Counts of the Complaint.

**STANDARD OF REVIEW**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a non-moving party is required to demonstrate that the causes of action alleged "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). In evaluating a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 68 (1st Cir. 2000). Additionally, when determining whether a complaint states plausible claims, courts must consider each well-pled allegation in the context of the entire world of allegations contained within the complaint rather than analyzing each allegation individually, separate from the context of the complaint as a whole. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011) ("Additionally, the district court erred when it failed to evaluate the cumulative effect of the factual allegations. The question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible.") (emphasis in original). A court may not disregard properly pled factual allegations, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)

**DISCUSSION**

I.   **Bates Repeatedly Levying Racially Charged Allegations of Sexual and Moral Impropriety at Coach Hall, Leading to the Termination of his Employment, Constituted "Adverse Action" Sufficient to Support Counts I-IV.**

Bates's first argument is for dismissal of the Counts of Plaintiffs' Complaint alleging improper retaliation against Coach Hall for his report that Bates was violating its legal obligations by placing his family in a mold infested home and the Counts alleging racial

discrimination by Bates against Coach Hall in the form of the repeated racially tinged unfounded accusations levied against Coach Hall.  This argument is based on the proposition that the Complaint fails to allege the existence of any "adverse action" against Coach Hall.  This argument, like many of Bates's arguments throughout its brief, is based on a combination of minimizing and taking out of context each of the repeated examples of intolerable accusations that Coach Hall was forced to endure throughout his tenure with Bates and on inviting the Court to make inferences against Plaintiffs' position that are impermissible on a motion to dismiss.

It is well established that the "adverse action" prong of a discrimination or retaliation claim can be satisfied through evidence that the defendant created a working environment so hostile as to render continuing to work there intolerable.  *See Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 353 (D. Me. 2018) ("Constructive discharge" is not a stand-alone cause of action but a way of satisfying the adverse action element of an employment discrimination claim.").

> An employee is constructively discharged if "the working conditions imposed by the employer," whether through discriminatory action or the creation of a hostile work environment, 'had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt *compelled* to resign," *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000) (emphasis added), and the employee did in fact resign because of the intolerable conditions, *Sullivan v. St. Joseph's Rehab. & Residence*, 143 A.3d 1283, 1288 (Me. 2016).

*Id.* (emphasis in original.)

As pleaded in the Complaint, and as the Court must accept as true for purposes of this motion, in response to his report of Bates's violation of the law and/or as a result of his status as a Black man, Bates subjected Coach Hall to a constant stream of the worst accusations against his integrity, all trafficking in the worst stereotypes about Black men that have existed for centuries, and all consistent with historical institutional racism that Bates has acknowledged was

"part of their daily existence" for Bates faculty and staff.  (ECF No. 1 at footnote 1, PageID # 1.)

Coach Hall repeatedly attempted to grapple with these accusations by availing himself of the formal processes offered by Bates, such as they were, including demanding to know the factual basis for any and all of the accusations made against him, and seeking assurances that the accusations would be investigated fully.  In response, Bates refused to disclose any facts that allegedly supported its accusations.  Then, although Coach Hall received assurances from various Black Bates employees that the accusations would be investigated, Coach Hall learned that these Black employees had seen their employment terminated shortly thereafter, with Coach Hall receiving no indication that any investigation whatsoever was conducted.   This was all followed in short turn by Bates misrepresenting its intention to fairly negotiate with Coach Hall over his continued employment, then notifying him nearly a year into these misrepresentations that the reason it was acting this way was because Coach Hall's employment stood on a "different" footing than anyone else's at Bates.  It is unsurprising, faced with all of the above, that Coach Hall felt he had no choice but to leave Bates and, indeed, have essentially no choice given Bates's refusal to negotiate a new contract.

As this matter proceeds through the discovery phase, Bates will have the opportunity to substantiate any argument that all of the above events have non-retaliatory and discriminatory explanations.  Through discovery, however, Plaintiffs will also be afforded for the first time the opportunity to mandate the disclosure of documentation that is solely within Bates's possession and control that could easily provide further support for Plaintiffs' retaliation and discrimination claims.  For present purposes, it is more than "plausible" that the explanation for all of the above described events is either explicit or implicit racial animus towards the first Black Head Coach in Bates's history, who was directly told by Bates administrators that his employment situation was

"different" from anyone else's.

Bates's argument that an employer is entitled to consistently lodge baseless racially charged accusations against an employee and otherwise, on account of his race or in response to having made a charge of illegal activity, force an employee to endure the most outrageous and racially charged accusations imaginable until that employee feels himself compelled leave should be rejected.

## II.   The Complaint Clearly States Facts From Which Racial Animus Can be Inferred Such as to Support Counts II-IV.

With respect Counts II-IV of the Complaint, which allege unlawful racial discrimination against Bates under the MHRA, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981, Bates argues, incredibly, that the Complaint fails to plausibly state facts supporting that Bates's actions against Coach Hall were based, at least in part, on racial animus.  *See Diaz v. Jiten Hotel Mgmt., Inc.*, 671 F.3d 78, 82 (1st Cir. 2012) (recognizing that a § 1981 plaintiff need not prove that racial discrimination was the only reason the defendant took action against him; instead, it is sufficient to establish that the defendant was partially motivated by racial animus).  In making this argument, Bates reaches the zenith of its attempt to take each individual accusation of outrageous racially charged behavior noted in the Complaint, address them individually, strip them of the context in which they appeared, and ask the Court to draw the most adverse possible inferences against Plaintiffs from such allegations.

Taken as a whole, and as described in painstaking detail above, the story of Coach Hall's employment with Bates is one in which the following all occurred in close succession to one another:  1) he was immediately treated in a manner that showed a lack of concern for his and his family's health and well-being; 2) he was charged with being dishonest and violating Bates rules by hiring his brother despite making known during his interview process that this his was

intention and receiving no negative feedback until after he was hired; 3) he was accused by Bates, with no factual support and no interest on Bates's part in the truth of the allegation, of using an anti-gay slur; 4) he was accused of religious coercion when he offered voluntary prayer opportunities to his players only to have Bates consider the same practice acceptable so long as it was overseen by a White man; 5) he, as a Black man operating in a predominantly White environment, was accused of sexual assault with no factual support and no interest on Bates's part in the truth of the allegation; 6) his assistant coach, also a Black man, was accused of sexual assault with no factual support and no interest on Bates's part in the truth of the allegation and with the Black Bates employee who promised to uncover the truth of the allegation terminated shortly thereafter; 7) Coach Hall and his assistant coach are accused of working with OIE to ensure that BIPOC football recruits receive sexual favors from Bates students; 8) Bates misleads Coach Hall into believing it intends to negotiate in good faith on the extension of his contract until the virtual eve of its expiration before notifying him that his contract situation is "different" from everyone else's and that such negotiations cannot, as a result, occur.

The above events are a case study in the gradual elevation of discriminatory behavior from subtext to as explicit text as one is likely to see.  None of the above incidents can be taken in isolation outside of the totality of the circumstances in which they occurred.  *See Ocasio-Hernandez*, 640 F.3d at 14.  Nor can they be taken out of the context of Bates's history of institutional racism and the broader historical and cultural history of specific forms of racist accusations against Black men, pleaded directly in the Introduction section of the Complaint in which it was averred, *inter alia*, that the above described incidents were examples of "severe racial discrimination" that "play[ed] on racist stereotypes."  (ECF No. 1 at Introduction, PageID ## 1-2.)

In light of the fact that Coach Hall, as Bates's first Black Head Coach stands on a different racial footing than most Bates employees, that he faced intolerable behavior against him that drew directly upon centuries of negative stereotypes specifically used against Black men, and the fact that Bates explicitly told Coach Hall that his contract situation was "different" from anyone else's, a perfectly plausible interpretation of these facts, taken as a whole, is that all of the above had its source, at least in part, in racial animus towards Coach Hall.  Bates is free to argue otherwise on the merits once the parties have had the opportunity to fully explore the facts. They cannot, however, bypass a full exploration of those facts simply by arguing, as they do in their motion, that they do not believe them to be true.[3]

## III.    The Complaint Adequately Pleads Facts Supporting a Defamation Claim.

"The elements of a defamation claim under Maine law are (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."  *Porietis v. Tradesmen Int'l, LLC*, 227 F. Supp. 3d 126, 140 (D. Me. 2017)

---

[3] Although Section II of Bates's brief purports to address only the dismissal of Plaintiffs' racial discrimination claims under Counts II-IV of the Complaint, (ECF No. 1 at p. 8, PageID # 71), the final paragraph of that Section also appears to argue for the dismissal of Plaintiffs' retaliation claim under Count I, (*Id.* at p. 14, PageID # 77).  As an initial matter, this argument is averted to in only a perfunctory manner and should be rejected on that basis alone.  *See, e.g., Theriault v. Genesis Healthcare LLC*, 2017 WL 1403162, at *9, n.17 (D. Me. 2017) (holding that the plaintiff had "failed to adequately develop this argument and the argument is therefore waived."), *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").  Beyond that, it is sufficient to note that Coach Hall was accused of sexual assault without basis for the first (but not the last) time only a month after he notified Bates that it was violating the law by forcing him to live in a black mold infested house.  This kind of intolerable behavior continued from that point in an unending stream until Coach Hall was forced to leave.  Temporal proximity alone, therefore, is sufficient to satisfy Coach Hall's burden of establishing a plausible causal connection between the two events.  *See Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014) ("a five-month period between the protected conduct and adverse employment action" constitutes "a far cry" from a case where the "pleadings [] allege a temporal gap so attenuated as not to meet the plausibility standard for surviving motions to dismiss").

(quotation marks omitted).  *Cyr v. Hannaford Bros. Co. LLC*, 2019 WL 1140180, at *10 (D. Me. 2019).  Contrary to Bates's argument, there are at least two examples of statements alleged in the Complaint that meet all these criteria.

First, is the September 13, 2019 statement by Bates's Title IX Officer, without support, that Coach Hall had committed sexual assault.  Taking the allegations of the Complaint as true, this statement was false, there was no basis upon which Bates could have reasonably believed it to be true, and it accused Coach Hall of a crime of sexual violence, warranting damages regardless of any actual impact on Coach Hall's reputation.  *See Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996) ("False accusations of criminal wrongdoing comprise defamation per se.")  Of course, the Complaint also alleges the significant harm this will cause Coach Hall in connection with his future employment prospects, satisfying both the actual damages and publication elements of a defamation claim.  *See Carey v. Mt. Desert Island Hosp.*, 910 F. Supp. 7, 10-13 (D. Me. 1995) (finding that self-publication can support the publication element of a defamation claim and that such cases "generally arise in employment disputes where the originator of the defamatory statement has reason to believe that the defamed person will be under strong compulsion to disclose the contents of the defamatory statement to a third-person.").

Separately, Bates also accused Coach Hall of soliciting Bates students to have sex with BIPOC football recruits he brought to campus.  This accusation was completely false, totally outrageous, without any factual support whatsoever, and accused Coach Hall of engaging in the criminal behavior of essentially acting as the leader of a flesh trading operation.  Thus, the first, third, and fourth elements of a defamation claim are easily satisfied.  With respect to the publication element, there is alleged to have been direct publication to at least Charlene Holmes and, in any event, this accusation is one that Coach Hall must explain to each potential employer

18

for the remainder of his career.

Based on the above, dismissal of Plaintiffs' defamation claims is inappropriate.

**IV.    Bates can be Held Liable for Negligence for its Failure to Disclose or Address the Existence of Black Mold in the Ware Street House.**

Finally, Bates misconstrues the allegations of the Complaint in arguing for dismissal of Plaintiffs' negligence claims.   In the Complaint, Plaintiffs allege that, prior to Plaintiffs moving to the Ware Street House, "the College had previously – and unsuccessfully – attempted to remediate black mold in the house" and that "[a]t no time prior to Coach Hall's move did Bates inform him of the presence of black mold, or of its previous, unsuccessful attempts to remediate that mold."  (ECF No. 1 ¶¶ 80-81, PageID # 10.)  It is a fair inference from these two statements, taken together, along with the fact that Plaintiffs have asserted a negligence cause of action, that Bates knew at the time that Plaintiffs moved to the Ware Street House that there was black mold there and was aware that its attempts to remediate that mold were unsuccessful.   The Complaint further explicitly alleges that, prior to his family moving, Bates "assured and reassured Coach Hall that any work necessary for health and safety purposes . . . would be done at Bates'[s] expense."  (ECF No. 1 ¶¶ 62, PageID # 10.)

In light of the above allegations, Bates is mistaken in arguing that the Law Court's recent opinion in *Boles v. White* supports dismissal here.  As Bates notes, in that case, the Law Court stated that a landlord can be held liable for a dangerous condition on property that is under a tenant's exclusive control, when the landlord either "fails to disclose the existence of a latent defect which he knows or should have known existed but which is not known to the tenant nor discoverable by him in the exercise of reasonable care" or where he "expressly agrees to maintain the premises in good repair."  *Boles v. White*, 260 A.3d 697, 700 (Me. 2021.)

The Complaint plainly alleges that Bates knew of the existence of the black mold and

knew or should have known that it had not been remediated when Plaintiffs moved. The fact that Plaintiffs did not themselves discover it until they had been living there for approximately a year, moreover, supports the fact that it could not have been reasonably discovered by Plaintiffs prior to moving in. Moreover, the Complaint alleges the existence of an express agreement on Bates's part to ensure that Bates would do whatever was necessary, at its own expense, to ensure the Ware Street House was a healthy and safe environment for Coach Hall's family.

This is not a case where it is alleged that Bates was taken unawares by a latent defect, or gratuitously offered to make repairs but fell short. Rather, this is a case where it is alleged that Bates expressly induced Coach Hall to move to the Ware Street House with a promise to keep it in a safe and healthful state, knew before Coach Hall's family moved that the house being offered contained black mold, knew or should have known that efforts to remediate the black mold had failed, and omitted to disclose these facts to Coach Hall, instead waiting for him to discover them after negative health effects had taken hold of his children.

Bates's arguments for dismissal of Plaintiffs' negligence claims are unavailing and should, like their other arguments addressed above, be rejected.

## **CONCLUSION**

For the reasons stated above, the Court should deny Bates's motion to dismiss.

Dated at Portland, Maine this 13th day of June 2022.

NORMAN, HANSON & DeTROY, LLC

/s/ Kelly M. Hoffman.
Kelly M. Hoffman, Esq.

/s/ David A. Goldman.
David A. Goldman, Esq.

20

Attorneys for Plaintiffs

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
khoffman@nhdlaw.com
dgoldman@nhdlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, I electronically filed **PLAINTIFFS'**

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** with the Clerk of Court using

the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ David A. Goldman
David A. Goldman, Esq.
Attorney for Plaintiffs

Norman, Hanson & DeTroy, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
dgoldman@nhdlaw.com