UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MALIK HALL and AYESHA HALL, | ) | |
| on their own behalf and as next friends | ) | |
| of their children, A.H., K.H., and M.H., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:22-cv-00090-JAW |
| | ) | |
| PRESIDENT AND TRUSTEES | ) | |
| OF BATES COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO DISMISS AND MOTION TO STRIKE**

A college moves to dismiss a nine-count complaint by its former football coach and his family alleging racial employment discrimination in violation of state and federal statutes, retaliation, defamation, and negligence.  The college also moves to strike references in the complaint to its alleged history of institutional racism.  The Court concludes that the plaintiffs have stated a valid claim on which relief can be granted for the discrimination, retaliation, and negligence claims, and denies the motion to dismiss as to all counts except for the defamation claim, which it dismisses without prejudice.  The Court also denies the motion to strike in its entirety.

**I.    PROCEDURAL HISTORY**

On April 7, 2021, Malik Hall and Ayesha Hall, on their own behalf and as next friends of their three minor children, A.H., K.H., and M.H. (collectively, the Halls), filed a complaint against the President and Trustees of Bates College (the College or Bates), alleging violations of the Civil Rights Acts of 1866 and 1964 and Maine's

Human Rights Act and Whistleblowers' Protection Act, as well as defamation and negligence. *Compl.* (ECF No. 1). On May 17, 2022, the College responded by filing a motion to dismiss the Complaint. *Mot. to Dismiss Counts IV-IX Pursuant to FED. R. CIV. P. 12(b)(6)* (ECF No. 10). That same day, the College moved to strike references in the Complaint to its alleged history of institutional racism. *Mot. to Strike and Incorporated Mem.* (ECF No. 11) (*Def.'s Mot. to Strike*). On June 13, 2022, the Halls filed their responses in opposition to both motions. *See Pls.' Opp'n to Def.'s Mot. to Dismiss* (ECF No. 14) (*Pls.' Opp'n to Mot. to Dismiss*); *Pls.' Opp'n to Def.'s Mot. to Strike* (ECF No. 15) (*Pls.' Opp'n to Mot. to Strike*). On June 27, 2022, the College filed its reply for each motion. *See Reply Mem. in Supp. of Mot. to Dismiss Pursuant to FED. R. CIV. P. 12(b)(6)* (ECF No. 16) (*Def.'s Reply in Supp. of Mot. to Dismiss*); *Reply Mem. in Supp. of Mot. to Strike Pursuant to FED. R. CIV. P. 12(f)* (ECF No. 17) (*Def.'s Reply in Supp. of Mot. to Strike*).

On September 19, 2019, the Court ordered the College to clarify the scope of its motion to dismiss. *Order* (ECF No. 18). The College responded to the Court's order two days later, clarifying that it sought dismissal of all counts in the Complaint, *Def.'s Response to Order to Clarify Scope of Def.'s Mot. to Dismiss* (ECF No. 19), and attached an updated motion to dismiss.[1] *Id.*, Attach. 1, *Mot. to Dismiss Pursuant to FED. R. CIV. P. 12(b)(6) [Amended Caption]*.

Finally, on September 26, 2022, the Court ordered that it would sua sponte treat the College's response as a motion to amend to correct clerical error, granted

---

[1]   The only change was to amend the caption of the motion to clarify that the College sought dismissal of all counts.

the motion, and made the attached motion the operative motion to dismiss.  *Order* (ECF No. 20); *see Mot. to Dismiss Pursuant to FED. R. CIV. P. 12(b)(6)* (ECF No. 21) (*Def.'s Mot. to Dismiss*).

## II.   FACTS[2]

Malik Hall and Ayesha Hall are married with three minor children, A.H., K.H., and M.H.  *Compl.* ¶¶ 2-4.  They are all Black individuals currently residing in Auburn, Maine.  *Id.*  Bates College is a private liberal arts college in Lewiston, Maine, and is registered as a Maine nonprofit corporation.  *Id.* ¶¶ 5-6.  It has more than 500 employees.  *Id.* ¶ 6.

### A.   Malik Hall's Football Background

Mr. Hall is a football coach with approximately eighteen years of experience. *Id.* ¶ 30.  In 2003, he graduated from the University of Massachusetts Amherst with a Bachelor of Arts degree in Sociology and Education.  *Id.* ¶ 15.  He played Division I football there, winning an Atlantic 10 Championship and playing under Head Coach Mark J. Whipple, formerly a coach for the National Football League's Cleveland Browns.  *Id.* ¶¶ 16-17.

After graduating, Mr. Hall coached football nearly continuously for the next eighteen years.  From February 2004 through November 2005, Mr. Hall was the Defensive Line Coach and Co-Special Teams Coordinator for Central Connecticut

---

[2]   Consistent with Federal Rule of Civil Procedure 12(b)(6), in describing the facts, the Court has relied upon the allegations in the Plaintiffs' Complaint. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68 (1st Cir. 2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) ("We examine whether the operative complaint states a claim for which relief can be granted when we construe the well-pleaded facts in the light most favorable to the plaintiffs, accepting their truth and drawing all reasonable inferences in plaintiffs' favor." (internal citation omitted)).

University. *Id.* ¶ 20. From July 2005 through August 2005, Mr. Hall was the Assistant Defensive Line Coach for the National Football League's Detroit Lions. *Id.* ¶ 21. From November 2005 through March 2006, Mr. Hall was the Defensive Line Coach and Co-Special Teams Coordinator for Fordham University. *Id.* ¶ 22. From March 2006 through March 2009, Mr. Hall was the Defensive Line Coach for Hofstra University. *Id.* ¶ 23. From April 2009 through February 2010, Mr. Hall was the Defensive Line Coach and Special Teams Coordinator for Fordham University. *Id.* ¶ 24. From February 2010 through June 2011, Mr. Hall was the Defensive Coordinator and Linebacker Coach for Wagner College. *Id.* ¶ 25. From June 2011 through December 2011, Mr. Hall was the Defensive Line Coach for the University of Massachusetts. *Id.* ¶ 26. From February 2012 through February 2015, Mr. Hall was the Defensive Coordinator and Linebackers Coach for Wagner College. *Id.* ¶ 27. From February 2015 through July 2018, Mr. Hall was the Defensive Line Coach for the University of Pennsylvania. *Id.* ¶ 28.

### B. Malik Hall's Hiring at Bates and the Family's Move

Most recently, Mr. Hall served as the Head Football Coach for Bates from July 2018 through July 2021. *Id.* ¶ 29. On June 13, 2018, he began the interview process to become the College's 20th Head Football Coach. *Id.* ¶ 31. The College had never had a Black Head Football Coach. *Id.* ¶ 32. Shortly after Mr. Hall's interview, the College offered him the position of Head Football Coach, and on June 16, 2018, he signed Bates' contract agreeing to take the job. *Id.* ¶¶ 36-37.

Mr. Hall knew that if Bates hired him, it wanted him to move quickly from his Philadelphia, Pennsylvania home to Lewiston, Maine, and begin his work as the

Head Football Coach. *Id.* ¶ 33. Because Mr. Hall's wife and three young children would be moving with him, he sought assurances from Bates that his family would be able to view potential homes during negotiations and to move quickly into an acceptable home if negotiations were successful. *Id.* ¶ 34. Although the College assured Mr. Hall that his family would be able to view potential homes during negotiations, no opportunity ever materialized. *Id.* ¶ 35.

On June 18, 2018, two days after signing his contract, Mr. and Mrs. Hall drove to Lewiston to view potential homes. *Id.* ¶ 39. The next day, the College showed them two options, one at 52 Ware Street (the Ware Street House) and the other at 93 Bardwell Street (the Bardwell Street House), both in Lewiston. *Id.* ¶¶ 39-42. The Ware Street House had enough space to accommodate the Halls but required a significant amount of work. *Id.* ¶ 41. The Bardwell Street House was too small to accommodate the family. *Id.* ¶ 42. Although Mr. Hall requested that the College accommodate his family's size by finishing the basement of the Bardwell Street House or adding another bedroom, it declined to do so. *Id.* ¶ 43. Provided no other options by the College, Mr. Hall accepted the Ware Street House for his family's housing. *Id.* ¶ 44. In so doing, Mr. Hall expected—and the College understood—that Mr. Hall had bargained to be able to move into the Ware Street House immediately upon moving to Maine. *Id.* ¶ 45. On June 20, 2018, Mr. Hall returned to Philadelphia to pack up his family and move to Lewiston. *Id.* ¶ 46. To his surprise and disappointment, however, he received an e-mail from Donna Sevigny, Assistant to the Vice President for Campus Life and Dean of Students, indicating that he and his family would be

required to stay in a hotel from approximately June 22, 2018, through July 2, 2018. *Id.* ¶ 47.

### C.   Malik Hall's Tenure as Head Football Coach

Almost immediately after Mr. Hall accepted the position, he began to encounter problems with the College. *Id.* at 2.

#### 1.   Ongoing Housing Issues

On June 21, 2018, Vice President for Campus Life and Dean of Students Joshua McIntosh (Vice President McIntosh) and Mr. Hall had a phone conversation about Mr. Hall's concerns regarding his housing situation. *Id.* ¶ 59. During that conversation, Vice President McIntosh assured Mr. Hall that Bates was working to secure housing for the Hall family, as they continued to live in a hotel. *Id.* ¶ 60. Mr. Hall agreed that the Ware Street House would be an acceptable place to live as long as work could be done to make it fit, healthy, and safe for his family to live there, and Vice President McIntosh also assured and reassured Mr. Hall that any work necessary for health and safety purposes, among others, would be done at the College's expense. *Id.* ¶¶ 61-62.

In the days and weeks after Mr. Hall and his family moved into the Ware Street House, it was obvious that the house needed significant work to make it an acceptable place to live from a habitability perspective, among others. *Id.* ¶ 78. The Ware Street House posed a significant health and safety risk to the Hall family. *Id.* ¶ 79. Specifically, Mr. Hall learned that the College had previously—and unsuccessfully— attempted to remediate black mold in the house. *Id.* ¶ 80. At no time prior to Mr.

Hall's move into the house did the College inform him of the presence of black mold, or of its previous, unsuccessful attempts to remediate that mold. *Id.* ¶ 81.

In August 2019, Mr. Hall reported the myriad mold issues to the College and provided several photographs of its widespread infiltration in the home's basement. *Id.* ¶ 82. Mr. Hall reported in good faith to the College that it was illegal and a violation of federal and Maine law to knowingly place his family in a mold infested facility and that its failure to remediate the known and ongoing health and safety violations was a continuing violation. *Id.* ¶ 83. Mr. Hall also notified the College that he was scheduling medical appointments to determine whether the mold was affecting his health, his wife's health, and his children's health, while adding that he himself had contacted SERVPRO (a restoration company) to evaluate the situation. *Id.* ¶ 84. The three Hall children have experienced illness as a result of the home's black mold—including difficulty breathing and nose bleeds—and will continue to suffer effects from the black mold into the future. *Id.* ¶ 85.

### 2.    The Nepotism Allegation

On June 24, 2018, Mr. Hall informed the College's Athletic Director (AD) Jason Fein and Vice President McIntosh that his brother, Jamier Hall, would be arriving shortly to join the Football Support Staff as the team's Video Coordinator. *Id.* ¶ 48. During and after the interview process, Mr. Hall had conveyed to the College that once he was hired as the Head Football Coach, he would hire Jamier Hall as a member of his staff. *Id.* ¶ 49. Mr. Hall was surprised and offended when AD Fein accused him of a lack of transparency and of engaging in nepotism by hiring Jamier

Hall. *Id.* ¶ 50. Prior to that conversation, the College had never informed Mr. Hall of any policy that would prevent him from hiring Jamier Hall, as he had always intended to do and as he had relayed to the College during the interview process and thereafter. *Id.* ¶ 51. Knowing that the team needed to have an in-house Video Coordinator in place as soon as possible because he had been hired so close to the start of the season, Mr. Hall had hired Jamier Hall to film and edit video of the team's games and practices. *Id.* ¶¶ 52-53. Mr. Hall believed that because Jamier Hall had previously and successfully worked as a Special Needs Educator in the Detroit Public Schools Tech Department, he was the right hire as the team's Video Coordinator. *Id.* ¶ 54. Given the urgent need for the team to have a Video Coordinator, Mr. Hall ultimately and begrudgingly agreed to retain Jamier Hall as a volunteer, rather than as a paid assistant. *Id.* ¶ 58.

### 3.    The Anti-Gay Slur Allegation

On August 16, 2018, Mr. Hall was faced with his second instance—within the first two months of his tenure—of being accused by the College of wrongdoing. *Id.* ¶ 64. Specifically, AD Fein confronted him regarding an alleged audio recording of Mr. Hall using an anti-gay slur while speaking to the Bates football team. *Id.* ¶ 65. Mr. Hall immediately and forcefully denied the accusations and asked to hear the alleged recording. *Id.* ¶ 66. Vice President Fein did not then—or at any later time—produce the alleged recording and, in fact, nobody associated with the College ever again spoke to Mr. Hall about this accusation. *Id.* ¶ 67. Prior to leveling this allegation

against Mr. Hall, the College did not conduct any investigation to determine whether he had, in fact, used an offensive slur. *Id.* ¶ 68.

### 4.     The Prayer Incident

On August 22, 2018, the Senior Associate Director of Athletics and Senior Woman Administrator for Bates (SWA) Celine Cunningham, instructed Mr. Hall to remove prayer from his practice schedule. *Id.* ¶ 69.   SWA Cunningham contended that some players may feel it was mandatory and that Mr. Hall had created a coercive environment for the team but, prior to accusing Mr. Hall of coercion, SWA Cunningham had not conducted any investigation into the manner in which prayer was incorporated into the football team's practices and before games. *Id.* ¶¶ 70-71. There has never been any indication that players felt coerced or offended by the way Mr. Hall included optional prayer during practices and before games and, had SWA Cunningham conducted any investigation, she would have discovered there was nothing coercive or offensive about the manner in which Mr. Hall included prayer as an optional team activity. *Id.* ¶¶ 72-73.   Regardless, in an effort to address SWA Cunningham's concerns and to avoid conflict with the College, Mr. Hall removed prayer from the practice schedule. *Id.* ¶ 74.

Thereafter, in an attempt to incorporate prayer in a way with which the College would be comfortable, Mr. Hall suggested and requested that the College's multi-faith chaplain lead the team in optional prayer before games. *Id.* ¶ 75. Following several conversations with school administrators, Mr. Hall was permitted to have the chaplain—who is white—lead the team in prayer. *Id.* ¶ 76.

9

###### 5.    The Sexual Assault Allegation

On September 13, 2019, Mr. Hall was called in to meet with the College's Title IX Officer, Gwen Lexow, at which time he was informed that he was being accused of sexual assault. *Id.* ¶¶ 86-87.  However, Title IX Officer Lexow refused to tell Mr. Hall who had accused him of sexual assault, the alleged nature of the sexual assault, and where or when it had allegedly occurred.  *Id.* ¶ 88.  Mr. Hall was disturbed and distraught by this latest charge against him and could not understand why he was being accused or who could be doing the accusing.  *Id.* ¶¶ 89-90.  Mr. Hall explained that as a Black football coach at a predominantly white school, any accusation of sexual impropriety on his part—even one as nebulous and unfounded as the one at issue—carried the likelihood of both ruining his career and placing a stigma on his family, friends, and the student-athletes whom he coached.  *Id.* ¶ 91.

This was especially so, given the historical and present-day difficulties for any Black person in securing a high-level football coaching position, and in the context of the racist tropes built into the American consciousness that Black men are somehow prone to engaging in sexual assault, particularly against white women.  *Id.* ¶ 92.  Mr. Hall has, in fact, always been scrupulous and hypervigilant in his behavior with students, in part because he is acutely aware that the National Football League has only one Black head coach,[3] even though approximately seventy percent of active players in the NFL are Black.  *Id.* ¶¶ 93-94.  Very simply, many of the players that

---

[3]     The NFL now has three Black coaches and one biracial coach, but this statistic appears to have been correct at the time the Complaint was filed.  *See* David Sheinin, et. al., *How the NFL Blocks Black Coaches,*    Wash.    Post.,    (Sept.    21,    2022),    at https://www.washingtonpost.com/sports/interactive/2022/nfl-black-head-coaches/.

have played for Mr. Hall look like him, but the inverse is not true: football across America remains primarily controlled and coached by white men. *Id.* ¶ 95.

Mr. Hall's hypervigilance was also, in part, due to his awareness that Black men historically and presently risk facing false allegations of sexual impropriety. *Id.* ¶ 96. Mr. Hall was crushed that this nightmare had come true, and as he stood in the staircase hallways upon leaving Title IX Officer Lexow's office, he began crying, something he can count on one hand the number of times that he has done in his life. *Id.* ¶¶ 97-98.

Outside that single conversation between Mr. Hall and Title IX Officer Lexow, the College has given Mr. Hall no additional information regarding the steps it took, if any, to investigate and clear him of the sexual assault allegations made on an unknown date by an unknown woman at an unknown location. *Id.* ¶ 99. On September 16, 2019, Mr. Hall met with Bates' Vice President for Equity and Inclusion Dr. Noelle Chaddock, to report in good faith that the racial discrimination he was facing was unlawful and wrong, and to discuss the racially charged accusations made against him and how he might—in light of everything that had occurred to date—be able to move forward at the College in a productive manner. *Id.* ¶ 100-02.

### 6.   The Allegations Relating to Custavious Patterson

On September 30, 2019, the football team's Offensive Coordinator, Custavious Patterson—who is also a Black man—told Mr. Hall that campus security had recently tried to force their way into his house at 2 a.m., claiming they had received reports of a woman screaming from inside his home. *Id.* ¶ 103. Neither Mr. Patterson nor Mr.

11

Hall has ever been presented by the College or anyone else with evidence to support that claim. *Id.* ¶ 104. Mr. Hall was shocked to learn of this additional unfounded and racially tinged implication of sexual assault and felt that these allegations reflected on his character as well, given that the incident occurred and the allegation was made against another member of his coaching staff so shortly after the racially charged allegation of sexual assault made directly against him. *Id.* ¶¶ 105-06.

Mr. Hall contacted the Director of Campus Safety, Douglass Morency, about this incident. *Id.* ¶ 107. Mr. Morency—who also is a Black man—assured him that he would investigate the matter, but separated from employment with the College shortly after, and Mr. Hall has never received any updates on the status of the investigation from the College into this incident, or whether any such investigation ever occurred. *Id.* ¶¶ 108-11.

On December 10, 2019, Title IX Officer Lexow informed Mr. Patterson that he had been accused of soliciting college students to have sex with football players whom he and Mr. Hall had recruited to the College.[4] *Id.* ¶ 112. The allegation extended to Mr. Hall as well. *Id.* at 1-2. However, neither Mr. Patterson nor Mr. Hall had any

---

[4]    The Complaint's introduction states that the College "fabricat[ed] claims that [Mr. Hall] and [Mr. Patterson] had arranged for students to have sex with football recruits." *Id.* at 2. However, the Complaint's more specific factual allegations claim only that Title IX Officer Lexow "informed Coach Patterson that *he* was accused . . ." and do not allege that Mr. Hall was also accused of this impropriety. *Id.* ¶ 112 (emphasis added).

In his opposition memorandum, Mr. Hall clarifies that the Complaint alleges that the sex-for-recruits allegation was made against both Mr. Patterson and Mr. Hall. *Pls.' Opp'n to Mot. to Dismiss* at 8 ("The next in the continuing litany of racially charged allegations levied against Coach Hall occurred less than two months later when Coach Hall was informed by Bates that he and Coach Patterson stood accused of the outrageous action of soliciting Bates students to have sex with football recruits who were on campus to tour Bates as part of their college selection process"). Based on Mr. Hall's memorandum and the language in one part of the Complaint, the Court accepts Mr. Hall's clarification that Bates told him that a sex-for-recruits accusation had been made against Mr. Patterson and him.

involvement in determining the students with whom recruits associated with while touring the College. *Id.* ¶ 113. They had instead involved the Office of Intercultural Education (OIE) in recruiting efforts to ensure that when recruits who were Black and Indigenous People of Color (BIPOC) toured the campus, they were assisted in those tours by BIPOC students. *Id.* ¶ 114. It was OIE that chose which students would conduct these tours, without the involvement of either coach. *Id.* ¶ 115. This process was managed by Charlene Holmes, a Black woman, who separated from employment at the College shortly after these alleged incidents. *Id.* ¶¶ 116-17.

The allegations against Mr. Hall and Mr. Patterson were and are untrue and implicate centuries of negative tropes surrounding Black men and their attempts to exist in white communities. *Id.* ¶ 118. However, the ease with which the College repeatedly allowed such racially charged allegations to be made compelled and forced Mr. Hall into a state of constantly defending himself layered over a new emotional state of pronounced anxiety, fear, and depression. *Id.* ¶ 119. No matter how unfounded these accusations were or how conclusively Mr. Hall could disprove them, Mr. Hall feels that the negative impact upon his reputation by virtue of even one allegation being made—much less repeated allegations in short succession—is impossible to overstate or underscore. *Id.* ¶ 120.

### 7.     The Final Year of Malik Hall's Contract

After these latest allegations, Mr. Hall began to experience consistent and unexplained resistance from the College in fulfilling his job responsibilities as he entered the final year of his contract in mid-2020. *Id.* ¶¶ 121-22.

At his annual performance review on May 5, 2020, Mr. Hall asked when negotiations would begin for a new contract and was told that the timing of such negotiations needed to take into account the attention being devoted to the COVID-19 global pandemic.  *Id.* ¶¶ 123-24.  Mr. Hall expressed his understanding of the difficulties posed by the pandemic and was assured that discussions regarding his next contract would begin shortly.  *Id.* ¶ 125.

On May 7, 2020, Mr. Hall requested what-should-have-been routine approval for a "Virtual Jr. Day Video," which is a tool used to recruit high school students.  *Id.* ¶ 126.  However, despite several follow-up requests, Mr. Hall never received such approval or any explanation as to why approval was not given.  *Id.* ¶ 127.

On May 8, 2020, in order to raise excitement and encourage donations to the football program, Mr. Hall requested approval for a fundraising information poster to send to football alumni.  *Id.* ¶ 128.  Despite making several requests for meetings, having approval meetings, and submitting yet more approval requests, Mr. Hall never received a response to his request for approval of this poster.  *Id.* ¶ 129.  As a result, the poster was never distributed to alumni and Mr. Hall was hampered in his ability to solicit donations towards fulfilling his job responsibilities.  *Id.* ¶ 130.

On February 4, 2021, Mr. Hall contacted the College to reiterate that his contract would be ending in June and that no discussions had yet occurred regarding a new contract.  *Id.* ¶ 131.  In response, the College invited Mr. Hall to a Zoom meeting on February 14, 2021, which he understood would be on the subject of discussing a new contract.  *Id.* ¶ 132.  Instead, during the Zoom meeting, the College rebuffed all

of Mr. Hall's attempts to discuss his contract.  *Id.* ¶ 133.  On April 4, 2021, Mr. Hall had a follow-up Zoom meeting with administrators at the College, again with the understanding that his contract situation would be the primary topic of discussion. *Id.* ¶ 134.  At this meeting, Mr. Hall expressed discomfort with the fact that his contract was set to expire in a matter of months, and no negotiations regarding a new contract had yet begun.  *Id.* ¶ 135.  However, despite his attempts to move discussions forward regarding a new contract, no progress was made at that meeting.

On May 11, 2021, Mr. Hall had another Zoom meeting with the College's administrators to discuss his soon-to-expire contract.  *Id.* ¶ 137.  In that meeting, the College informed Mr. Hall for the first time that there would be no contract negotiations.  *Id.* ¶ 138.  The College further informed Mr. Hall that his situation was different than anyone else's at the College and that, as a result, its attorney(s) would need to review the matter before any further discussions could take place.  *Id.* ¶ 139. Finally, in July 2021, the College announced that Mr. Hall would not be returning as its Head Football Coach for the 2021-2022 season.  *Id.* ¶ 140.

### D.    The Complaint

The Halls' Complaint states nine causes of action.  Count I alleges that the College's conduct violates Maine Whistleblowers' Protection Act (MPWA) as enforced through the Maine Human Rights Act.  *Id.* ¶¶ 141-42.  Count II alleges unlawful racial employment discrimination, also in violation of the Maine Human Rights Act (MHRA).  *Id.*  ¶¶  143-44.    Count  III  alleges  unlawful  racial  employment discrimination in violation of Title VII of the Civil Rights Act of 1964, including under 42 U.S.C. § 2000e-2.  *Id.* ¶¶ 145-46.  Count IV alleges unlawful race discrimination

under § 1981 of the Civil Rights Act of 1866.  *Id.* ¶¶ 147-48.  Count V alleges
defamation against Mr. Hall.  *Id.* ¶¶ 149-51.  While Counts I-V all relate to injuries
suffered by Mr. Hall, Counts VI-IX allege negligence by the College relating to
damages suffered by Mrs. Hall and the three minor children as a result of mold in the
Ware Steet House.  *Id.* ¶¶ 152-63.

## III.   THE PARTIES' ARGUMENTS

### A.   The College's Motions to Dismiss

#### 1.   Counts I-IV Do Not Allege Any Adverse Action

The College argues that Counts I-IV, the retaliation and racial discrimination
claims, fail to state a claim because they do not allege any adverse action suffered by
Mr. Hall, a requirement for each of his employment discrimination theories.  *Def.'s
Mot. to Dismiss* at 6 (citing cases discussing the elements of MPWA, MHRA, Title
VII, and § 1981 claims).  "Given that an adverse employment action is a well-
understood and straightforward proposition, the Complaint is eerily silent about
what it was."  *Id.* at 7.  It notes that the Complaint does not state that the contract
was allowed to expire or terminate, or that Mr. Hall was offered a new extension and
refused to sign or affirmatively quit.  *Id.*  "The Complaint leaves us in the dark," as it
"is just as plausible that the College offered him a new contract, or an extension of
his existing contract, and that he rejected it, or simply failed to act on it—none of
which would be actionable under the MWPA, the MHRA, Title VII, or Section 1981—
as it is that the College decided not to offer it, or otherwise acted to end his
employment."  *Id.*

The College also adds that "[t]his [is] not a situation where the plaintiff does not have access to the facts in question." *See id.* at 7-8 (citing *Brady v. Bath Iron Works Corp.*, 2016 WL 3029948, at *2 (D. Me. May 25, 2016)). "This gap—a chasm, really—involves facts that [Mr.] Hall would surely know, making their omission particularly telling" and "[t]his obvious failure to allege any adverse action seeks to draw the Court into improper speculation about whether one occurred, and if so what it was." *Id.* at 8. Because "[t]here are no allegations of specific acts of . . . discrimination that are intentional and purposeful" these "allegations do not possess enough heft to show [entitlement] to relief" and thus "Counts I, II, III and IV should be dismissed." *Id.* (citations and internal quotations omitted).

### 2.    Counts II-IV Do Not Allege Racial Animus

The College also argues that Mr. Hall's MHRA, Title VII, and § 1981 claims fail because he does not allege facts from which racial animus can be plausibly inferred. *Id.* at 8-14. To assert a § 1981 claim, a plaintiff must allege "'with specificity circumstances giving rise to a plausible inference of racially discriminatory intent . . . . conclusory allegations of racially motivated animus are insufficient.'" *Id.* at 8 (quoting *Johnson v. City of New York*, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009)). Similarly, "claims of racial discrimination under the MHRA and Title VII require a showing of (1) membership in a protected class; (2) job performance in keeping with the employer's expectations; and (3) adverse treatment based on protected class status." *Id.* at 9 (citations omitted). The College does not dispute "[Mr.] Hall's status as an African-American" nor "his job performance"; instead, it argues that "Counts II, III and IV fail on the issue of discrimination based on race." *Id.* In its view, "[n]one

17

of the seven alleged events that purport to show an intention to discriminate against [Mr.] Hall with respect to the end of his employment involves any statement or action from which such animus can be inferred." *Id.*

The College then goes on to outline its position why each of those seven alleged events lacks evidence of racial animus. AD Fein's statement about nepotism was "indisputably true"—Mr. Hall acknowledges hiring his brother and does not dispute that the College has a nepotism policy—and Mr. Hall does not allege that he "was singled out for enforcement while white employees were allowed to violate the policy." *Id.*

Regarding the anti-gay slur, AD Fein told Mr. Hall that he had received information that Mr. Hall had been recorded uttering an anti-gay slur but, while Mr. Hall denies using the slur, he does not allege that Fein fabricated the report or that there was anything "express or implied about this scenario suggesting a connection to [Mr.] Halls' [sic] race." *Id.* at 8-9. Similarly, regarding the sexual assault allegation, "it is the job of a college Title IX Officer to address complaints of sexual misconduct" and "[t]he mere report to [Mr.] Hall that such a complaint had been received provides no basis for an inference of racial animus." *Id.* at 9.

Regarding the prayer incident, the College argues that "Hall is apparently attempting to create an inference that allowing the College's white multi-faith chaplain to conduct voluntary prayer before football games is evidence of racial animus" and that "[s]uch an inference is . . . entirely speculative." *Id.* at 10. The two incidents relating to Mr. Patterson—the woman allegedly screaming in his house and

the sex-for-recruits allegation—have "nothing to do with [Mr.] Hall" and, "[a]s with the others, no racial animus is plausibly inferable from [them]." *Id.* at 10-11. Finally, regarding the mold allegations, Mr. Hall has made "no allegation that would support imputing this purported knowledge to any agent of the College" and "[n]owhere . . . is there the slightest suggestion of racial animus on the part of any person." *Id.* at 11.

In sum, "[o]f the above six statements, only four pertain to [Mr.] Hall, and he only disputes two of them (the anti-gay slur and the sexual assault)" and, for the two disputed statements, "[w]hat he disputes is not that the two individuals who received and relayed these accusations to him . . . were truthfully relating what had been reported to them, but the veracity of the underlying accusations themselves." *Id.* at 12. Even taken in combination with the mold claim, "they do not provide any basis for inferring discriminatory (or, in the case of Count I, retaliatory) animus on the part of any particular actor or actors whose actions and animus could plausibly be imputed to the College." *Id.* at 13. Mr. Hall "mentions no comparators, even in the most general, conclusory sense," but "[i]f any of these events is to serve as an adverse action, at the very least an allegation of disparate treatment as compared to non-protected class members is required." *Id.* at 13-14 (citing *Bina v. Providence Coll.*, 39 F.3d 21, 24-25 (1st Cir. 1994)).

Finally, the College argues that Mr. Hall's whistleblower retaliation claim should fail because it requires three elements—protected activity, adverse employment action, and causation—and Hall has only sufficiently pleaded the first. *Id.* at 14. The College reiterates that Mr. Hall has not alleged an adverse employment

action and adds that "the claim offers no allegations that would support an inference of causal connection between the mold report and his departure from the College . . . [b]ecause the events occurred 23 months apart, no inference of causation based on temporal proximity arises."  *Id.* at 14 (citing *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 23, 126 A.3d 1145, 1153, as corrected (Mar. 8, 2016)).

### 3.   Count V Does Not Allege Sufficient Facts to Establish a Defamation Claim

The College begins by outlining that under Maine law the elements of a defamation claim are: (1) a false and defamatory statement pertaining to the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) defamation per se or special harm. *Id.* (citations omitted).  It charts out each of the six statements previously identified against each of the four defamation elements.  *Id.* at 15.  The Court need not reproduce the chart in full but, in sum, the College contends that: (1) the only possibly false statements are those relating to the sexual assault allegation and anti-gay slur, and they are only false if no complaints were actually made; (2) no statement was published to a third party; (3) no statement involved fault amounting to at least negligence; and (4) the only statements possibly defaming  Mr. Hall—if the other elements were met—were those regarding the sexual assault allegation and the anti-gay slur. *Id.* at 15-17.

### 4.   Counts VI-IX Fail to State Claims of Negligence

Finally, the College addresses the Hall family's mold-related negligence claims.  Bates construes the Complaint to read that "Plaintiffs are claiming that the

College breached its duty of care as a landlord with regard to a dangerous condition" and, more specifically, that the Complaint alleges the College "failed to disclose a latent defect." *Id.* at 17. Because the Complaint "makes no allegations with regard to an 'express agree[ment] to maintain the premises in good repair[,]'" any "negligence claim must rest on either (1) a failure by the College to disclose the existence of a latent defect which it knew existed but which was not discoverable by the Hall family in the exercise of reasonable care, or (2) the College's negligent performance of gratuitously undertaken repairs arising from its discovery of and failure to remediate the mold." *Id.* at 17-18 (quoting *Boles v. White*, 2021 ME 49, ¶ 7, 260 A.3d 697, 700).

Regarding the latent defect theory, the College acknowledges that despite the lack of the details in the Complaint "[i]t might nevertheless suffice, for purposes of notice pleading, to plausibly allege the landlord's knowledge of the latent defect presence of mold, were it not for what is, and is not, included in Plaintiffs' other allegations." *Id.* at 18. Unpacking that somewhat confusingly worded assertion, the College argues that it relinquished control of the house to the Halls in July 2018, but the Halls did not report the mold problem until more than a year later, in August 2019. *Id.* at 19. The mold thus "was not discoverable at the time they moved in," *id.* at 19, and therefore "there is no plausible basis for a claim that, at the time the College's duty of care arose to the Halls in the summer of 2018, it had knowledge of the presence of mold at 52 Ware Street." *Id.* at 20. By contrast, "if the Halls *did* detect the presence of mold near the time they moved in, then the mold was not a

latent defect, and the College had no duty to disclose it or remedy it." *Id.* at 20 n.13 (citation omitted) (emphasis in original).

Regarding the negligent repair theory, the College argues that if it repaired the defect prior to the Halls' arrival and the Halls did not discover mold for a year, then the repairs could not have been negligently performed. *Id.* at 20. Alternatively, if the repairs failed to rectify the mold problem and "the Halls sat on their knowledge of the mold for a year . . . they therefore do not allege a plausible claim of causation against the College." *Id.*

### B.    The Halls' Opposition to the Motion to Dismiss

#### 1.    Racially Charged Allegations Leading to the Termination of Malik Hall's Employment Constituted an "Adverse Action" Sufficient to Support Counts I-IV

The Halls counter that "[i]t is well established that the 'adverse action' prong of a discrimination or retaliation claim can be satisfied through evidence that the defendant created a working environment so hostile as to render continuing to work there intolerable." *Pls.' Opp'n to Mot. to Dismiss* at 13 (citing *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 353 (D. Me. 2018)). Under this theory, an employee is "constructively discharged"—satisfying the adverse action requirement—if "'the working conditions imposed by the employer,'" whether through discriminatory action or the creation of a hostile work environment, "'had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign.'" *Id.* (quoting *Charette,* 332 F. Supp. 3d at 353) (emphasis and internal quotations omitted).

22

The Halls recount the alleged incidents of racial discrimination and conclude that "[i]t is unsurprising, faced with all of the above, that [Mr.] Hall felt he had no choice but to leave Bates and, indeed, have essentially no choice given Bates's refusal to negotiate a new contract." *Id.* at 14. They also urge the Court to reject "Bates's argument that an employer is entitled to consistently lodge baseless racially charged accusations against an employee and otherwise, on account of his race or in response to having made a charge of illegal activity, force an employee to endure the most outrageous and racially charged accusations imaginable until that employee feels himself compelled leave." *Id.* at 15.

### 2. The Complaint States Facts from Which Racial Animus Can Be Inferred Sufficient to Support Counts II-IV

The Halls note at the outset that "a § 1981 plaintiff need not prove that racial discrimination was the only reason the defendant took action against him; instead, it is sufficient to establish that the defendant was partially motivated by racial animus." *Id.* at 15 (paraphrasing *Diaz v. Jiten Hotel Mgmt., Inc.*, 671 F.3d 78, 82 (1st Cir. 2012)). They recount each incident where Mr. Hall was allegedly mistreated and characterize them together as "a case study in the gradual elevation of discriminatory behavior." *Id.* at 16. None of these incidents "can be taken in isolation outside of the totality of the circumstances in which they occurred . . .. Nor can they be taken out of the context of Bates's history of institutional racism and the broader historical and cultural history of specific forms of racist accusations against Black men." *Id.* Because "a perfectly plausible interpretation of these facts, taken as a whole, is that all of the above [incidents] had [their] source, at least in part, in racial animus

towards [Mr.] Hall," the College may not prevail on its motion to dismiss these counts. *Id.* at 17.

In a footnote, the Halls also urge the Court to reject the College's argument for dismissal of the Count I retaliation claim. As a procedural matter, they contend that Section II of the College's brief purported to address only Counts II-IV (the racial discrimination claims), yet the College also argued in a lone paragraph at the bottom for dismissal of Count I. *Id.* at 17 n.3. In the Halls' view, this argument is referenced "in only a perfunctory manner and should be rejected on that basis alone." *Id.* (citing *Theriault v. Genesis Healthcare LLC*, 2017 WL 1403162, at *9, n.17 (D. Me. 2017) and *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). They also oppose the College's position on the merits, countering that "[Mr.] Hall was accused of sexual assault without basis . . . only a month after he notified Bates that it was violating the law" and "[t]his kind of intolerable behavior continued from that point in an unending stream until [Mr.] Hall was forced to leave." *Id.* Thus "[t]emporal proximity alone" is sufficient to establish "a plausible causal connection between the two events." *Id.* (citing *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014)).

### 3. The Complaint Pleads Facts Supporting a Defamation Claim

The Halls next contend that "[c]ontrary to Bates's argument, there are at least two examples of statements alleged in the Complaint that meet all the[] criteria" required to establish a defamation claim. *Id.* at 18. The first is "the September 13, 2019 statement by Bates's Title IX Officer, without support, that [Mr.] Hall had

24

committed sexual assault," which "was false, there was no basis upon which Bates could have reasonably believed it to be true, and it accused [Mr.] Hall of a crime of sexual violence, warranting damages regardless of any actual impact on [Mr.] Hall's reputation." *Id.* (citing *Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996)). The Complaint also alleges "the significant harm this will cause [Mr.] Hall in connection with his future employment prospects, satisfying both the actual damages and publication elements of a defamation claim." *Id.* (citing *Carey v. Mt. Desert Island Hosp.*, 910 F. Supp. 7, 10-13 (D. Me. 1995)).

The second allegedly defamatory statement occurred when "Bates also accused [Mr.] Hall of soliciting Bates students to have sex with BIPOC football recruits he brought to campus." *Id.* This accusation was "was completely false, totally outrageous, without any factual support whatsoever, and accused [Mr.] Hall of engaging in . . . criminal behavior," thus satisfying the false statement, fault, and actionability/harm elements of a defamation claim. *Id.* The fourth and final element, unprivileged publication, was established by the allegation of "direct publication to at least Charlene Holmes" or, alternatively, because "this accusation is one that [Mr.] Hall must explain to each potential employer for the remainder of his career." *Id.* at 18-19.

While the parties disagree on these two statements, the Halls do not directly oppose or respond to the College's contention that none of the other incidents or statements recounted in the Complaint could establish a defamation claim (aside from arguing that "at least" the two aforementioned statements qualify). *Id.* at 18.

### 4.      The College Can be Held Liable for Negligence

Finally, the Halls argue that "Bates misconstrues the allegations of the Complaint in arguing for dismissal of Plaintiffs' negligence claims."  *Id.* at 19. Pointing to their statements in the Complaint, they contend that it "plainly alleges that Bates knew of the existence of the black mold and knew or should have known that it had not been remediated when Plaintiffs moved," and that it also alleged "the existence of an express agreement" from the College to ensure that the house was "a healthy and safe environment."  *Id.* at 18-19.  Contrary to the College's position, "[t]his is not a case where it is alleged that Bates was taken unawares by a latent defect, or gratuitously offered to make repairs but fell short."  *Id.* at 20.  Instead, the Halls have alleged that "Bates expressly induced [Mr.] Hall to move to the Ware Street House with a promise to keep it in a safe and healthful state, knew before [Mr.] Hall's family moved that the house being offered contained black mold, knew or should have known that efforts to remediate the black mold had failed, and omitted to disclose these facts to [Mr.] Hall."  *Id.*

### C.      The College's Reply in Support of its Motion to Dismiss

### 1.      The Complaint Fails to Allege Facts That Would Plausibly Support Discriminatory or Retaliatory Animus

In reply, the College argues that the Halls have "fail[ed] to address the fundamental flaw in their Complaint: the lack of facts that support the existence of discriminatory or retaliatory animus with respect to any of the events and individuals on which they base their claims for relief."  *Def.'s Reply in Supp. of Mot. to Dismiss* at 1-2.  Instead, they "rely on allegations of 'systemic racism' as a proxy for those missing

facts." *Id.* at 2. The Court should consider the College president's references to the concept of systemic racism following the murder of George Floyd as made "in concert with hundreds of other leaders of higher education institutions" and in the "context of ongoing, albeit lamentably inadequate, efforts to eliminate vestiges of inequality caused by the historical fact of slavery and the aftermath of its abolition." *Id.* It would be "far too great a leap" to claim that this acknowledgement "constitutes a plausible basis for asserting actual discriminatory animus on the part of specific individuals," as "[i]f that were the case, *any* adverse action involving any minority employee at any employer would constitute actionable discrimination." *Id.* (emphasis in original).

### 2.   Replies to Specific Claims

The College goes on to briefly address specific arguments raised by the Halls relating to: (1) the constructive discharge theory of adverse action; (2) the self-publication theory of defamation; (3) the temporal proximity of Mr. Hall's whistleblower retaliation claim; and (4) the negligence claims.

### a.   Constructive Discharge

The College notes that "the Complaint is calculatingly silent on the manner of [Mr.] Hall's departure," not "even alleg[ing] that he resigned, let alone that he was forced to do so." *Id.* However, even an allegation that he had resigned would not support a constructive discharge theory because constructive discharge requires "working conditions so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign." *Id.* at 3 (quoting *Torrech-Hernandez v. General Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008)). Additionally, "[Mr.] Hall alleges nothing—

no events, no actions, no statements at all—between the fall of 2019 and the spring of 2021, in connection with his contract status" and "[h]e makes no allegations that Bates took any adverse employment action against him—or indeed visited any consequences on him at all—for any of those events." *Id.*

### b. Defamation

Mr. Hall's defamation claims rely on the theory of compelled self-publication, which "rests on the premise that an employee who is terminated for false reasons that are damaging to his or her reputation has been compelled to publish that information to a prospective employer." *Id.* However, even under this theory his claims fail because "the allegations do not plausibly support an actual publication." *Id.* at 3-4 (citing cases). Mr. Hall does not allege that he has told anyone about the sexual assault or sex-for-recruits accusations, so the idea of self-publication is purely speculative and, moreover, he does not allege that the College took any kind of disciplinary action against him relating to either allegation that would compel him to explain himself to a prospective employer. *Id.* at 4.

### c. Whistleblower Retaliation

The College next argues that the Halls misunderstand the temporal proximity requirement of a whistleblower retaliation claim. While the Halls argued that temporal proximity existed because the sexual assault allegation was made against Mr. Hall only a month after his report of the mold, "it is the proximity between the protected activity and the alleged adverse action that matters." *Id.* at 4-5. A mere report to an employee that they have been accused of sexual assault "is not a legally cognizable adverse action" and, even assuming that Mr. Hall's dismissal or contract

nonrenewal constituted an adverse action, "there is a twenty-month gap—September 2019 to June 2021—which is far too great to support any inference of causal connection." *Id.* at 5 n.3 (citing *Brady*, 2015 ME 143, ¶ 23, 126 A.3d at 1153).

### d.   Negligence

The College also disputes the Halls' account of the timeline and circumstances relating to mold in the Ware Street House.  In their view, "[the] only plausible reading of the Complaint" is that the College "offered to provide housing . . . needed to do work on the house to make it ready, and did that work over the course of the following month" and that the Halls moved in, found the house "in satisfactory condition," and "only noticed a problem when they reported the presence of mold thirteen months later." *Id.* at 6.  Thus, "based on the actual facts alleged, the mold was a latent defect at the time of their occupancy" and the Halls cannot maintain their negligence claims. *Id.*

### 3.   The Halls' Opposition Contradicts Their Complaint

The College's final argument focuses primarily on a perceived admission made by the Halls in their opposition:

> Bates argues that all of these allegations were made in good faith by third-parties, not by Bates itself, and that various rules are what prohibited them from disclosing any facts to [Mr.] Hall. The truth of the facts underlying these arguments are something that can only be determined, however, in the context of sworn testimony and compelled document production, not something the Court can infer is true from bare assertions made in a pleading responsive to Plaintiffs' Complaint.

*Id.* at 6-7 (quoting *Pls.' Opp'n to Mot. to Dismiss* at 6-7 n.1).  In the College's view, this acknowledgment that all allegations against Mr. Hall were made not by the College, but by third parties acting in good faith has "opened the door for the Court

to see how they have mischaracterized facts that they do include, such as by alleging that Defendant groundlessly accused [Mr.] Hall of misconduct . . . when they know—and even say they know—that those accusations came from third parties." *Id.* at 7.

### D.    The College's Motion to Strike

The College also filed a motion asking the Court to strike references to its alleged history of institutional racism, which consist of a single reference in the Complaint to the College's "tortured and well-documented record of institutional racism," supported by one footnote and three exhibits. *Def.'s Mot. to Strike* at 1. The footnote states, in its entirety:

> *See, e.g.*, LETTER FROM BATES COLLEGE PRESIDENT CLAYTON SPENCER (JUNE 15, 2020); LETTER TO SPENCER (JUNE 10, 2020) (asserting the racism and oppression experienced by Bates faculty and staff "as part of their daily existence"); Black At Bates (@blackatbates), INSTAGRAM, https://www.instagram.com/blackatbates/?hl=en (last visited Apr. 7, 2022) (recounting a Black student's experience in which Bates' Athletic Administrators informed him that he was "really smart 'for a football player'" and that he "must be 'the smartest Black athlete on campus'"). True and accurate copies of the referenced documents are attached hereto as Exhibits A, B, and C respectively.

*Compl.* at 1 n.1.

Exhibit A is an open letter written by Bates President Clayton Spencer to the Bates community in June 2020, entitled "the Work of Antiracism at Bates" that details actions the College was taking "to disrupt structural racism on this campus, in the lives of our faculty and staff, and in the education of our students" in the aftermath of the murder of George Floyd. *Id.*, Attach. 1 at 1 (*Spencer Letter*).

Exhibit B consists of an open letter written to President Spencer five days prior and signed by more than 500 people, criticizing President Spencer for an earlier

statement that "erase[d] the faculty and staff at all levels that experience racism and oppression at Bates as part of their daily existence," and calling on her to issue a statement acknowledging the College's "role in acts of oppression and harm against BIPOC faculty, staff, and students" and develop a plan to combat racism. *Id.*, Attach. 2 at 1 (*Community Letter*). Exhibit B also includes an email from an author of the letter describing its contents and a newspaper article describing the letter and surrounding context. *Id.* at 3-7.

Finally, Exhibit C is as described: an Instagram post purportedly written by a Black Bates football player who had been told by campus administrators that he was "really smart for a football player" and "must be the smartest Black athlete on campus." *Id.*, Attach. 3 (*Instagram Post*) (internal quotations omitted).

The College notes that under Federal Rule of Civil Procedure 12(f) a party may ask the Court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter" and that courts are afforded broad discretion to decide these motions. *Def.'s Mot. to Strike* at 2. In the College's view, these references have "no essential or important relationship to Plaintiffs' claims, nor are they necessary to the issues raised by the Complaint." *Id.* (internal quotations omitted). Bates says that none of these exhibits references the Halls in any way nor bears any connection to the alleged incidents, and "[t]he inclusion of this material serves only as a cynical attempt to associate Bates' genuine efforts to respond to the events overtaking the country . . . with [Mr.] Hall's specious claims of discrimination and retaliation." *Id.*

The College acknowledges that it "is mindful of the disfavored nature of Rule 12(f) motions to strike," *id.* (citing *McGlauflin v. RCC Atl. Inc.*, 269 F.R.D. 56, 57 (D. Me. 2010)), but insists that it "has targeted this Motion at specific content that is truly immaterial and offered in claimed support of an allegation that is intended both to mask the lack of a factual basis for [Mr.] Hall's discrimination claims, and to prejudice potential jurors." *Def.'s Mot. to Strike* at 3.

### E.   The Halls' Opposition to the Motion to Strike

In response, the Halls counter that these references "provide[] important context for the specific claims asserted" by Mr. Hall that the College "generally expos[ed] [Mr.] Hall to an unending torrent of racially charged accusations that made his continued employment at Bates impossible." *Pls.' Opp'n to Mot. to Strike* at 1-2. They argue that the College's assertion that the references will be prejudicial is "pure speculation" insufficient to support a motion to strike. *Id.* at 3. Ultimately, "the objective reality is that Plaintiffs' allegations of historical institutional and national racism are related to, pertain to, and broadly inform the plausibility of the accusations of racially discriminatory behavior that form the basis of many of the claims asserted in the Complaint." *Id.* at 4.

### F.   The College's Reply in Support of its Motion to Strike

Finally, in reply, the College disputes the Halls' assertion that the contested references provide important context for their claims. "Rather than adding important context, the referenced information is used to deflect attention away from the Complaint's factual deficiencies by hiding them behind Bates' supposed 'tortured and well documented record of institutional racism . . .,'" with the Halls "citing only

generalized examples in support." *Def.'s Reply in Supp. of Mot. to Strike* at 1. Contrary to the Halls' assertion, they "do not actually allege any statements made or actions taken by any individual identified in the Complaint, or by the catchall 'Bates College', against [Mr.] Hall that suggest a discriminatory or retaliatory animus." *Id.* at 2.

Because the Halls offer no evidence of racial animus, the supposed "important context" is actually "nothing more than an attempt to invoke generalized, sensational, highly charged societal ills as a proxy for the kind of specific factual allegations that are necessary to support the Complaint's legal claims." *Id.* at 3.

## IV.   LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir.

2012)); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)).  This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'"  *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis."  *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements").  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

Regarding a Motion to Strike, Rule 12(f) of the Federal Rules of Civil Procedure provides:

> The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

FED. R. CIV. P. 12(f).  "A Rule 12(f) motion is directed to the discretion of the court." *McGlauflin v. RCC Atl., Inc.*, 269 F.R.D. 56, 57 (D. Me. 2010); *see also Morell v. United States*, 185 F.R.D. 116, 118 (D.P.R. 1999); 5C CHARLES ALAN WRIGHT & ARTHUR R.

MILLER, FEDERAL PRACTICE AND PROCEDURE § 1381 (3d ed. 2004) (WRIGHT & MILLER).

Motions to strike, however, are not favored, since "[m]odern litigation is too

protracted and expensive for the litigants and the court to expend time and effort

pruning or polishing the pleadings." WRIGHT & MILLER § 1382 (2009 Supp.). In

general, a motion to strike should be denied unless it is clear that the challenged

matter "can have no possible bearing on the subject matter of the litigation." *Berke

v. Presstek, Inc.*, 188 F.R.D. 179, 180 (D.N.H. 1998) (citation omitted); WRIGHT &

MILLER § 1382.

## V.    DISCUSSION

### A.    Bates College's Motion to Strike

The Court turns first to the motion to strike.  The College has asked the Court

to strike the reference to its purported "tortured and well-documented record of

institutional racism" as well as three supporting exhibits: the open letter from

President Spencer; the open letter to President Spencer and related news article; and

the Black at Bates Instagram Post.  *Def.'s Mot. to Strike* at 1.  The bar for a motion to

strike is high and the Court finds that the College fails to clear it because the

challenged references are not immaterial, impertinent, or prejudicial.

To start, the Court emphasizes that—as the College recognizes—motions to

strike are "disfavored" and "are rarely granted absent a showing of prejudice to the

moving party." *Nelson v. Univ. of Maine Sys.*, 914 F. Supp. 643, 646 (D. Me. 1996).

"Immaterial" has been defined as a matter "which has no essential or important

relationship to the claim for relief or the defenses being pleaded." WRIGHT & MILLER

§ 1382.  "If part of the challenged material is found to be so connected with the subject

matter of the suit that it might be deemed to present a question of law or fact that the district court is obligated to hear and determine, it cannot be stricken as impertinent." *Id.*

With these principles in mind, the Court considers the College's motion to strike. The gravamen of the Halls' Complaint is that the College "subjected [Mr. Hall] to repeated and severe racial discrimination." *Compl.* at 1. The Court will later discuss the elements required to sustain a racial discrimination claim, but at this point it is relevant that for such claims "[d]irect evidence, 'i.e. statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision,' [is] relatively rare and, thus, most plaintiffs rely upon circumstantial evidence." *Morales v. Fed. Express Corp.*, No. CV 20-11434-NMG, 2022 U.S. Dist. LEXIS 111939, at *9 (D. Mass. June 24, 2022) (quoting *Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 52 (1st Cir. 2021)). Here, Mr. Hall has outlined a string of incidents which—while none may individually establish direct evidence of racial animus—he alleges together comprise a pattern of racial discrimination. For the Court to fairly weigh his claims it must consider, under the totality of the circumstances, whether the College's actions were racially motivated. Evidence that the College mistreats or has historically mistreated Black faculty is relevant to that analysis, even if not directly probative of Mr. Hall's claims.

The 2020 letter from President Spencer suggests that the College "continue[s] to fall short in making 'the emancipating potential of the liberal arts' a reality for all

36

of our . . . faculty," that "[t]he issues of structural racism that Bates partakes of are long-standing and deeply ingrained," and that "we have not achieved a campus and culture where . . . faculty and staff from traditionally underrepresented groups are adequately supported in their professional growth and development." *Spencer Letter* at 2. The letter from members of the Bates community criticized President Spencer for previously "eras[ing] the faculty and staff at all levels that experience racism and oppression at Bates as part of their daily existence" and calls for a statement acknowledging "the institution's role in acts of oppression and harm against BIPOC faculty, staff, and students." *Community Letter* at 1. Given the circumstantial nature of Mr. Hall's claim, the Court also does not conclude that these letters—written contemporaneously with his allegations of racist treatment by the College—have "no essential or important relationship to the claim for relief or the defenses being pleaded." WRIGHT & MILLER § 1382.

Regarding the College's contentions that this material could prejudice a jury, this argument confuses allegations in a complaint with evidence at trial. The fact that the Court does not strike an allegation from a complaint does not mean that the plaintiff will (or will not) be able harden the assertion into admissible evidence. Moreover, the allegation is that the President of Bates and members of the Bates' community acknowledged the College "partakes" in "issues of structural racism" of "long-standing and [which are] deeply ingrained." Clearly, it could be relevant if Mr. Hall is able to establish at trial that Bates' treatment of him is consistent with Bates' admitted history of structural racism. Similarly, the Court finds no issue with the

inclusion of the news article describing the exchange, although for Mr. Hall to admit the contents of a news article into evidence at trial may well prove challenging.

In a similar vein is the Black at Bates Instagram Post, describing a Bates football player being told by Athletics Office employees that he was "really smart for a football player" and must be "the smartest Black athlete on campus."  As the post bears generally on the subject at issue—alleged racism by College employees directed at a Black member of the football program—the allegation is not subject to being stricken, leaving aside whether it would be admissible.

Finally, the Court turns to the assertion purportedly supported by the three exhibits: that the College has a "tortured and well-documented history of institutional racism."  *Compl.* at 1.  The Court finds this assertion is not immaterial or impertinent for the reasons discussed previously, as a history of institutional racism at the College could be relevant to Mr. Hall's claim.

The only example the College cites of a court striking somewhat similar assertions from a complaint is *Porter v. Pipefitters Association Local Union 597, U.A.*, 2013 WL 5162206, at *5 (N.D. Ill. Sept. 12, 2013).  But the *Porter* Court struck from the plaintiffs' complaint more than seventy examples of discrimination "starting in the 1800s" as "irrelevant to their claims as well as impertinent and inflammatory." *Id.*  Here, the Complaint includes only a single assertion of institutional racism, supported by three exhibits.  Also, in contrast to *Porter*, the letters here describe "issues of structural racism" and "the institution's role in acts of oppression" not around the time of Bates' founding but at the time Mr. Hall allegedly suffered racial

discrimination at the hands of College officials. *Spencer Letter* at 2; *Community Letter* at 1.

Because the Court does not find the challenged material to be immaterial, impertinent, or prejudicial, it DENIES Bates College's Motion to Strike (ECF No. 11).

## B.   Bates College's Motion to Dismiss

The Court now addresses the College's motion to dismiss all nine counts of the Halls' Complaint: a retaliation claim (Count I), three racial discrimination claims (Counts II-IV), a defamation claim (Count V), and four negligence claims (Counts VI-IX).   Finding that the Halls successfully pleaded the essential elements of the retaliation, discrimination, and negligence claims, the Court denies the motion to dismiss as to Counts I-IV and VI-IX.   Mr. Hall's defamation claim, however, fails to pass muster and the Court grants the motion to dismiss without prejudice as to Count V.

### 1.   Counts II-IV: The Discrimination Claims

The Court begins with Mr. Hall's racial discrimination claims.   Counts II-IV allege racial discrimination in violation of the MHRA, Title VII, and § 1981, respectively.   The College argues that all three counts should be dismissed because the allegations Mr. Hall has pleaded support neither an adverse action nor racial animus.   The Court disagrees.

#### a.   Legal Standard

To start, the Court applies the same standards for the Title VII, MHRA, and § 1981 racial discrimination claims.   Title VII protects against workplace discrimination on the basis of certain protected categories, including race.   42 U.S.C.

§ 2000e et seq.  The MHRA protects the interests of individuals in fair employment against discrimination on the basis of race, amongst other categories.  5 M.R.S. § 4552.  Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Maine courts have used federal precedent surrounding Title VII for the purposes of construing and applying the provisions of the MHRA.  *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053 (Me. 1992); *see Knight v. O'Reilly Auto Enters., LLC*, No. 2:17-cv-300-NT, 2019 U.S. Dist. LEXIS 47018, at *8 n.2 (D. Me. Mar. 21, 2019) ("Maine courts look to Title VII caselaw when considering MHRA claims") (citing *Cole v. Maine Office of Info. Tech.*, No. 1:17-CV-00071-JAW, 2018 U.S. Dist. LEXIS 163857, 2018 WL 4608478, at *27 (D. Me. Sept. 25, 2018)).  Maine courts also apply the same Title VII standards to claims of employment discrimination brought under § 1981.  *See Jones v. Jasper Wyman & Son*, No. 1:20-cv-00383-JAW, 2022 U.S. Dist. LEXIS 126860, at *121 (D. Me. July 18, 2022); *see also Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).  Accordingly, the Court applies the same legal standards in considering whether the Title VII, MHRA, and § 1981 claims survive the College's motion to dismiss.  *See Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 n.3 (1st Cir. 1997); *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 18-19 (1st Cir. 1999).

To state a cognizable racial discrimination claim, a plaintiff must establish that "(1) [he] is a member of a racial minority; (2) the defendant discriminated against [him] on the basis of [his] race; and (3) the discrimination implicated one or more of

the activities listed in the statute, including the right to make and enforce contracts." *Hammond v. Kmart Corp.*, 733 F.3d 360, 362 (1st Cir. 2013). Additionally, a § 1981 plaintiff must "plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020). At the pleading stage, the plaintiff "need not *establish*" a causal link between his race and the adverse action; instead, "the facts contained in the complaint need only show that the claim of causation is plausible."[5] *Fazeli v. Northbridge Stroudwater Lodge II LLC*, No. 2:20-cv-00350-JDL, 2021 U.S. Dist. LEXIS 84599, at *12 (D. Me. May 4, 2021) (citing *Rodríguez-Reyes*, 711 F.3d at 56) (emphasis in *Fazeli*). The College does not dispute that Mr. Hall, as a Black man, is a member of a protected minority. Instead, it contends that Mr. Hall's discrimination claims should be dismissed because he has failed to adequately plead (1) "any adverse [employment] action" or (2) "facts from which racial animus can be plausibly inferred." *Def.'s Mot. to Dismiss* at 6-14. The Court addresses those arguments in turn and finds them lacking.

### b.   Adverse Action

The College argues that the racial discrimination claims "all share the same deficiency with respect to their common element of adverse employment action." *Id.*

---

[5]      The First Circuit stated that "[t]he prima facie standard is an evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013). Because the prima facie "elements are part of the background against which a plausibility determination should be made" the Court uses these elements "as a prism to shed light upon the plausibility of [Mr. Hall's] claim." *Id.* at 54. To the extent that Mr. Hall properly alleges a prima facie case, "it ipso facto satisfies the plausibility standard." *Corson v. Modula, Inc.*, No. 2:20-CV-104-DBH, 2020 U.S. Dist. LEXIS 128437, at *14 (D. Me. July 21, 2020) (concluding that where the plaintiff meets the prima facie standard in her complaint, she simultaneously pleads a plausible claim to defeat a motion to dismiss).

at 6.  More specifically, "the Complaint is eerily silent about what [the action] was . . . Was [Mr. Hall's] contract allowed to expire?  He doesn't say.  Was it terminated?  He doesn't tell us.  Was he offered an extension or new contract that he refused to sign?  Did he affirmatively quit?  Again, silence.  For his employment to have ended, at least one of these events had to have happened."  *Id.*  The College goes on to suggest that it "is just as plausible that the College offered [Mr. Hall] a new contract, or an extension of his existing contract, and that he rejected it, or simply failed to act on it . . . as it is that the College decided not to offer it, or otherwise acted to end his employment."  *Id.*  Mr. Hall counters that the adverse action element can "be satisfied through evidence that the defendant created a working environment so hostile as to render continuing to work there intolerable," a situation known as a "constructive discharge."  *Pls.' Opp'n to Mot. to Dismiss* at 14.

An alleged adverse action "must be cast in objective terms" as "the mere fact than an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."  *Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir. 1996).  It "typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) (internal quotation marks omitted).  In general, "[d]etermining whether an action is materially adverse necessarily requires a case-by-case inquiry."  *Blackie*, 75 F.3d at 725.

At the outset, the Court finds it unhelpful that Mr. Hall has not included more detail in the Complaint about how his employment at the College came to an end. The record is unclear whether he left of his own accord or was forced to depart because his contract was not renewed.  The Complaint alleges that the College "rebuffed all of [Mr.] Hall's attempts to discuss his contract," and that on May 11, 2021 he was told there would be no contract negotiations and that the College's attorneys would need to review "the matter" before any further discussions could take place.  *Compl.* ¶¶ 134-39.  But, after that point, all the Complaint alleges is that "[i]n July 2021, Bates announced that [Mr.] Hall would not be returning as its Head Football Coach for the 2021-2022 season."  *Id.* ¶ 140.

The Court is left guessing what happened in between: whether Mr. Hall left voluntarily before his contract expired, was offered a new contract and rejected it, or was forced to leave because his existing contract expired and the College refused to offer him an extension or renewal.  Mr. Hall's opposition brief sheds little light on the issue, offering only that "[i]t is unsurprising, faced with all of the [alleged abuse], that [Mr.] Hall felt he had no choice but to leave Bates and, indeed, [had] essentially no choice given Bates's refusal to negotiate a new contract."  *Pls.' Opp'n to Mot. to Dismiss* at 14.

Based on the allegations in the Complaint, the Court concludes that Mr. Hall is alleging that Bates failed or refused to renew his employment contract.  While the parties briefed the theory of constructive discharge as a potential basis for adverse action, the Court sets that theory aside for purposes of ruling on the motion to dismiss

and concludes instead that the Complaint has alleged an adverse action sufficient to survive a motion to dismiss under the theory of contract nonrenewal.  As the question on a motion to dismiss is whether a count survives and not whether potential theories underlying the count do, the Court will turn to the theory that does survive dismissal, leaving for another day the merits of the theory of constructive discharge.

While the facts surrounding Mr. Hall's departure are frustratingly vague, First Circuit caselaw has clearly recognized "the failure to renew an employment contract as an adverse employment action cognizable under Title VII."  *Hernandez-Mejias v. Gen. Elec.*, 428 F. Supp. 2d 4, 7-8 (D.P.R. 2005) ("we agree with the overwhelming majority of courts that non-renewal of an employment contract constitutes an adverse employment action"); *see also Kassaye v. Bryant College*, 999 F.2d 603, 607 (1st Cir. 1993) (noting that refusal to renew employment contract may provide grounds for Title VII complaint); *Decotiis v. Whittemore*, 635 F.3d 22, 30 n.5 (1st Cir. 2011) ("For purposes of a First Amendment retaliation claim, the non-renewal of an employee's contract constitutes an adverse employment action"); *Velazquez-Velez v. Molina-Rodriguez*, 327 F. Supp. 3d 373, 379 n.6 (D.P.R. 2018) (same); *Mateu–Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 625 (7th Cir. 2002) (finding, in contract-renewal Title VII case, "it is undisputed that [plaintiff] . . . suffered an adverse employment action"); *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 300 F.Supp.2d 836, 851-52 (W.D. Wis. 2004) (Title VII applies "equally to both termination decisions and the refusal to re-hire").  The First Circuit has characterized the "prima facie case as a small showing . . . that is not onerous . . . and is easily made," *Kosereis v. Rhode*

*Island*, 331 F.3d 207, 213 (1st Cir. 2003) (internal citations and quotation marks omitted), and the Court finds that—despite the murkiness of the allegations—Mr. Hall has pleaded sufficient facts that a reasonable jury could conclude that the College refused to renew his contract and this nonrenewal qualified as an adverse employment action.

According to the Complaint, the College "rebuffed all of [Mr.] Hall's attempts to discuss his contract" in three meetings and, in the final meeting a month before the contract was set to expire, told him that "there would be no contract negotiations." *Compl.* ¶¶ 131-38.  Nothing in the Complaint suggests that the College wavered in its position that it would not negotiate for or offer a contract renewal, and it then—shortly after the initial contract was set to expire—announced that Mr. Hall would not be returning.  The ambiguity in the Complaint makes this a close call, but the Court finds that, based on those facts, a reasonable jury could conclude that the College followed through on its refusal to even discuss a contract renewal and that this refusal to renew Mr. Hall's contract qualified as an adverse action.

Though the Court concludes that Mr. Hall has pleaded just enough to establish an adverse action sufficient to defeat a motion to dismiss, it recognizes that this adverse action rests on sparsely seeded and fallow ground.  If the discovered facts do not justify the theory, Bates may file a motion for summary judgment, where the Court can reach whether individual theories underlying a count survive, but at this point, the Court is ruling on and drawing inferences solely from the allegations in the Complaint to determine whether the counts themselves must be dismissed.

Thus, for today, however, Mr. Hall's Complaint has established an adverse action sufficient to support his racial discrimination claims at the motion to dismiss stage.

### c.      Racial Animus

To state a racial discrimination claim, a plaintiff must also show (unsurprisingly) that "the defendant discriminated against [him] on the basis of [his] race."[6]  *Hammond,* 733 F.3d at 362.  At this stage, he "need not *establish* a causal link between his race and the adverse action; instead, the facts contained in the complaint need only show that the claim of causation is plausible." *Fazeli*, 2021 U.S. Dist. LEXIS 84599, at *12 (internal quotation marks omitted) (emphasis in *Fazeli*). Although a plaintiff "need not plead facts sufficient to establish a prima facie case" of discrimination to survive a motion to dismiss, he "must plead enough facts to make entitlement to relief plausible in light of the evidentiary standard that will pertain at trial." *Rodríguez-Reyes*, 711 F.3d at 54.  "Because a plaintiff may prevail on a discrimination claim, even at summary judgment, without introducing direct evidence of bias, [he] need not plead facts that demonstrate overt discrimination in order to survive a motion to dismiss[.]" *Fazeli*, 2021 U.S. Dist. LEXIS 84599, at *20; *see also Corson*, 2020 U.S. Dist. LEXIS 128437, at *5 ("If the pleaded facts meet the prima facie standard, that should suffice" to satisfy the plausibility standard).

---

[6]      While the College argues that it did not subject Mr. Hall to an adverse action and that, even if it did, there was no causal connection between the action and his race, it does not contest that he has established the other elements of a prima facie discrimination case: "that [plaintiff] is a member of a protected class who met its employment expectations." *Jones*, 2022 U.S. Dist. LEXIS 126860, at *125; *Def.'s Mot. to Dismiss* at 9 ("[Mr.] Hall's status as an African-American is not in dispute, nor is his job performance").

Ultimately, at this stage Mr. Hall must plead facts supporting a plausible inference of racial discrimination causally liked to the adverse action.

The College submits that "[n]othing in the Complaint alleges any sort of disparate treatment from which discriminatory animus could be inferred." *Id.* at 13. Mr. Hall recounts the incidents outlined in the Complaint and counters that "a perfectly plausible interpretation of these facts, taken as a whole, is that all of the above had its source, at least in part, in racial animus towards [Mr.] Hall." *Pls.' Opp'n to Mot. to Dismiss* at 17. By the Court's count, Mr. Hall's Complaint pleads nine discrete incidents or categories of purportedly racist conduct: the undisclosed mold, the nepotism incident, the anti-gay slur incident, the prayer incident, the sexual assault accusation against Mr. Hall, the apparent sexual assault accusation against Mr. Patterson, the sex-for-recruits allegation, withholding approval for Mr. Hall's recruiting and fundraising materials, and the refusal to negotiate a contract extension (including the statement that Mr. Hall's situation was "different").

"The question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible" and no single allegation need "lead to the conclusion . . . of some necessary element, provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14-15 (1st Cir. 2011) (emphasis in original). In other words, this is a contextual analysis, with the Court tasked to "evaluate the cumulative effect of the factual allegations." *Id.* at 14. Here, no individual allegation

standing alone appears overtly racist or establishes discriminatory animus. However, accepting as true all well-pleaded facts and viewing the evidence in the light most favorable to Mr. Hall, the context supports a different story.

In this narrative, Mr. Hall arrived on campus to a college-provided home that was infested with black mold that the College was aware of and had failed to remediate, and he became worried that this mold might sicken him, his wife and their children. *Compl.* ¶¶ 79-85. Later, after medical appointments, his three children all experienced illness, including difficulty breathing and nose bleeds, and continue to have symptoms. *Id.* ¶ 85. The Complaint alleges that Mr. Hall's wife and three children "suffered and continue[] to suffer physical and emotional damages" from their exposure to the black mold. *Id.* ¶¶ 152-63. Even though he had told the College during his interview process that he planned to hire his brother, the College later vetoed the hiring and accused Mr. Hall of nepotism. *Id.* ¶¶ 49-55. Shortly thereafter, the College told him he was being accused (falsely) of using an anti-gay slur. *Id.* ¶¶ 65-68. Next, the College told him he had been accused (falsely) of sexual assault and that it was investigating the accusation. *Id.* ¶¶ 87-88. A few months later, the College accused him (falsely) and his assistant coach of soliciting students to have sex with football recruits. *Id.* at 2. The College refused to tell Mr. Hall anything further about any of these allegations and investigations and never produced any evidence against him, but never informed him he had been cleared of wrongdoing. The following year, the College, without explanation, began ignoring or refusing to approve his routine requests for fundraising and recruiting materials. *Id.* ¶¶ 126-30.

Finally, as his contract neared expiration, the College repeatedly rebuffed his attempts to discuss an extension or renewal, offering as explanation only that—as its first Black football coach—"his situation was different than anyone else's at Bates and that, as a result, its attorney(s) would need to review the matter before any further discussions could take place." *Id.* ¶¶ 131-39.

Given the College's absence of an explanation, at this stage, for the repeated false accusations and other indignities, and its refusal even to discuss an extension because Mr. Hall's situation was "different," the Court finds that the cumulative effect of the factual allegations would allow a reasonable jury to infer racial animus as a plausible explanation for the College's conduct and eventual refusal to renegotiate or renew Mr. Hall's contract. *See Sepúlveda–Villarini v. Dep't of Educ. of P.R.,* 628 F.3d 25, 30 (1st Cir. 2010) ("A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss"); *Ocasio-Hernandez,* 640 F.3d at 12 (same).

Because Mr. Hall has established all the required elements to support his § 1981, MHRA, and Title VII racial discrimination claims, the Court DENIES Bates College's Motion to Dismiss as to Counts II-IV.

### 2.    Count I: The Retaliation Claim

Mr. Hall also alleges that the College retaliated against him in violation of the MWPA and the MHRA.  The MWPA provides, in relevant part:

> **1. Discrimination prohibited.**  No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

> **A.** The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

26 M.R.S. § 833(1)(A).  The plaintiff has the "undemanding task of demonstrating a prima facie case[7] of unlawful retaliation." *Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 64 (D. Me. 2010) (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir. 1991)).  To establish a prima facie case of retaliation under the MWPA the plaintiff must show: "(1) []he engaged in activity protected by the statute, (2) []he was the subject of adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." *Sullivan v. St. Joseph's Rehab. & Residence*, 2016 ME 107, ¶ 14, 143 A.3d 1283 (internal quotation marks omitted).

Similarly, pursuant to the MHRA,[8] "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S. § 4633.  As with the MWPA, a plaintiff bringing a claim for retaliation

---

[7]     The pleading standard here is the same as for the discrimination claims. The First Circuit has stated that "[t]he prima facie standard is an evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint." *Rodríguez-Reyes*, 711 F.3d at 54. Because the prima facie "elements are part of the background against which a plausibility determination should be made" the Court uses these elements "as a prism to shed light upon the plausibility of [Mr. Hall's] claim." *Id.* To the extent that Mr. Hall properly alleges a prima facie case, "it ipso facto satisfies the plausibility standard." *Corson*, 2020 U.S. Dist. LEXIS 128437, at *14.

[8]     "The MWPA and the MHRA do not contemplate separate whistleblower causes of action. Rather, the MHRA provides a cause of action to persons aggrieved by violations of the MWPA." *Thayer*, 2011 U.S. Dist. LEXIS 74229, at *50.

under the MHRA "must show that: (1) he engaged in protected conduct under the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action." *Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 58 (1st Cir. 2002).

The Complaint alleges two instances where Mr. Hall engaged in protected conduct: (1) in August 2019, he "reported in good faith to Bates that it was illegal and a violation of federal and Maine law to knowingly place his family in a mold infested facility and that its failure to remediate the known and ongoing health and safety violations was a continuing violation"; and (2) on September 16, 2019 he met with the College's Vice President for Equity and Inclusion, Dr. Noelle Chaddock, to report "that the racial discrimination he was facing was unlawful and wrong." *Compl.* ¶¶ 82-83, 101-02. The College does not dispute that Mr. Hall has sufficiently pleaded protected conduct under the MHRA and MWPA but contends that he has failed to plead adverse action and causation. *Def.'s Mot. to Dismiss* at 14. The Court has already discussed adverse action and found that Mr. Hall has successfully pleaded adverse action by contract nonrenewal. The only remaining question is causation.

The College argues that Mr. Hall "offers no allegations that would support an inference of causal connection between the mold report and his departure from the College." *Id.* It adds that between the protected conduct and Mr. Hall's departure "there is a twenty-month gap—September 2019 to June 2021—which is far too great to support any inference of causal connection." *Def.'s Reply in Supp. of Mot. to Dismiss* at 5 (citing *Brady,* 2015 ME 143, ¶ 23, 126 A.3d at 1153). The College's

51

causation argument relies heavily on *Brady* and the Law Court's statement that the plaintiff bears the burden of "producing some evidence from which a reasonable jury could find a causal link" between the protected conduct and adverse action, and interprets *Brady* to stand for the proposition that "a gap of nearly two years between alleged protected activity and adverse employment action [is] too long to infer causation without additional supporting evidence." *Def.'s Mot. to Dismiss* at 14. While technically true, the Court does not conclude that it is the correct lesson to draw from *Brady*.

In *Brady*, the trial court had concluded in granting summary judgment to the defendant that "[t]he timing of events in this case [a two-year time lapse] is plaintiff's greatest obstacle to demonstrating a prima facie case," but the Law Court vacated that order, stating:

> It is true that "[t]emporal proximity . . . may serve as the causal link for purposes of a prima facie case" by supporting an inference of causation . . .. The inverse, however, is not true: the lack of temporal proximity, although potentially persuasive, is not dispositive, and in the context of a summary judgment motion it does not compromise a plaintiff's prima facie case. *See Murphy v. United States Dep't of Veterans Affairs*, No. 1:12–cv–379–DBH, 2013 WL 4508346, at *6, 2013 U.S. Dist. LEXIS 119869, at *20 (D. Me. Aug. 23, 2013) (stating that "the lapse of time alone is not a basis for summary judgment"). At trial, the fact-finder would be entitled to find that the passing of a significant amount of time between an employee's protected activity and subsequent adverse employment action diminishes the likelihood that the two were causally connected. A jury, in other words, may reject an employee's contention that the employer was merely lying in wait. That, however, is a question of how much weight to assign to the evidence, which is necessarily a determination that can be made only at trial. Thus, even though a significant period of time elapsed between Brady's complaints and his demotion, on a motion for summary judgment the lack of temporal proximity is not, as a matter of law, a dispositive factor. Instead, Brady

> has the burden of producing some evidence from which a reasonable jury
> could find a causal link—a burden that he has met here.

2015 ME 143, ¶ 23, 126 A.3d at 1153-54. The Law Court concluded that "even without the evidentiary benefit of temporal proximity, [the plaintiff] ha[d] produced sufficient circumstantial evidence to generate a triable claim of a causal relationship, and, in combination with evidence of protected activity and adverse employment action, he therefore has made out a prima facie case of retaliation in the workplace." *Id.*, ¶ 24, 1154. This Court reads *Brady* to prescribe that, for causation, "the lack of temporal proximity is not . . . a dispositive factor" and the weighing of the evidence is a question for the jury, so at the pleading stage a plaintiff needs only to "produc[e] some evidence from which a reasonable jury could find a causal link" between the protected activity and adverse action. *Id.* ¶ 23-24, 1153-54.

Mr. Hall met that burden. The Law Court in *Brady* found that—even with a two-year time lapse—the plaintiff had met his burden where he showed evidence of: (1) differential treatment in the workplace; (2) a "disproportionate response" to his alleged wrongdoing, as measured against the results of an investigation; and (3) communications channels that would naturally allow his complaints to reach decisionmakers. *Id.* ¶ 17, 1151. The Law Court did not say that a plaintiff must show evidence of all three factors (or even that these are the only three factors to consider); instead, it found that this "cumulative evidence" was sufficient for a jury to find causation. *Id.* ¶ 22, 1153.

Mr. Hall has produced evidence of all three factors. Regarding differential treatment, even setting aside the multiple false accusations (which the Court infers

are unlikely to have been common to other employees), Mr. Hall has alleged that, when attempting to discuss a contract extension, the College told him "that his situation was *different than anyone else's at Bates* and that, as a result, its attorney(s) would need to review the matter before any further discussions could take place." *Compl.* ¶ 139 (emphasis added). A jury could reasonably conclude from this statement—and the ensuing refusal to renegotiate or renew—that Mr. Hall was treated differently from other employees.

Second, the *Brady* Court considered that the plaintiff had "produced evidence that the actions taken against him may have been unreasonably disproportionate to the violations that he committed," after an internal investigation concluded there was no probable cause to charge him with a crime. 2015 ME 143, ¶ 20, 126 A.3d at 1152-53. Here too, a reasonable jury could find that the College's position that Mr. Hall's situation was "different" and thus his contract would not be renewed was related to the sexual assault and sex-for-recruits allegations which were—as far as the record shows—untrue and never substantiated by any evidence. If so, that jury could also conclude the punishment of nonrenewal was "a disproportionate response to [Mr. Hall's] alleged violation, as measured by the results of the initial investigation into [his] alleged wrongdoing." *Id.* ¶ 17, 1151.

Finally, the Law Court in *Brady* considered that "although there was no direct evidence that [the decisionmaker] knew about [plaintiff's] complaints, a reasonable jury could attribute [the decisionmaker's] alleged disproportionate response to a retaliatory motivation because it could infer that [the decisionmaker] had learned of

[plaintiff's] complaints" through "communications channels . . . that would naturally allow those complaints to reach the decision-makers." *Id.* ¶¶ 17, 21, 1151, 1153. Mr. Hall's Complaint does not make clear who made the decision not to renew his contract or what channels of communication existed within the College's administration. In Mr. Hall's Maine Human Rights Commission Complaint of Discrimination, *Compl.,* Attach. 4 (ECF No. 1-4), however, he states that he reported the mold issue to five people, including "Mr. McIntosh" and "Mr. Fein." *Id.* ¶ 29. Presumably, "Mr. McIntosh" is Vice President for Campus Life and Dean of Students Joshua McIntosh and "Mr. Fein" is Athletic Director Jason Fein, whom Mr. Hall had dealt with regularly. *Compl.* ¶ 48. While it is unknown who was the ultimate decisionmaker, the record includes direct evidence that Dr. Chaddock, Mr. McIntosh, and Mr. Fein were each aware of at least one of Mr. Hall's protected complaints. A jury could reasonably infer that the College's Athletic Director was involved in the hiring (and terminating) of its coaches or—at the very least—in close communication with the person(s) who were.

Mr. Hall has thus produced evidence to support each of the three factors considered by the Law Court in *Brady* to constitute "cumulative evidence" sufficient to allow a jury to infer causation. 2015 ME 143, ¶ 22, 126 A.3d at 1153. Whether it would ultimately do so is a question for another day, but for the purposes of this motion Mr. Hall has met his threshold burden by "producing some evidence from which a reasonable jury could find a causal link" between the protected activity and adverse action. *Id.* ¶ 23-24, 1153-54.

Because Mr. Hall has established protected activity, adverse action, and causation sufficient to support a retaliation claim at the pleading stage, the Court DENIES Bates College's Motion to Dismiss as to Count I.

### 3.    Count V: The Defamation Claim

The Court concludes that the allegations as pleaded in Mr. Hall's Complaint are too threadbare and vague to sustain his defamation claim.  Under Maine law, a defamation claim has four elements:

> (1) a false and defamatory statement concerning another;
>
> (2) an unprivileged publication to a third party;
>
> (3) fault amounting at least to negligence on the part of the publisher;
>
> (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Cain v. Sambides*, No. 1:20-cv-00071-JAW, 2020 U.S. Dist. LEXIS 203446, at *5-6 (D. Me. Nov. 2, 2020); *Waugh v. Genesis Healthcare LLC*, 2019 ME 179, ¶ 10, 222 A.3d 1063, 1066 (Me. 2019) (citing *Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996)).  Mr. Hall's Complaint does not specify which statements by the College he believes are defamatory, but his response indicates that he believes that "there are at least two examples[9] of statements alleged in the Complaint that meet all [the] criteria" including "the September 13, 2019 statement by Bates's Title IX Officer, without support, that [Mr.] Hall had committed sexual assault" and "also accus[ing] [Mr.] Hall of soliciting Bates students to have sex with BIPOC football recruits he brought to

---

[9]    The Court will assess the two statements Mr. Hall identifies in his response but will not scour the Complaint to see if any other statements that he has not identified may qualify.

campus." *Pls.' Opp'n to Mot. to Dismiss* at 18.  Both fail to establish the necessary elements to support a defamation claim and the Court will thus grant the College's motion as to Count V.  The statements are similar, so the Court considers them together.

The first element requires a false and defamatory statement.  *Id.*  Whether a false statement is defamatory is a question of law.  *Rippett,* 672 A.2d at 86 (citing *Bakal v. Weare*, 583 A.2d 1028, 1030 (Me. 1990)).  Maine's courts consider the ordinary meaning of a statement to decide whether it is defamatory.  *See Gavrilovic v. Worldwide Language Res., Inc.*, 441 F. Supp. 2d 163, 182 (D. Me. 2006) (citing *Ballard v. Wagner*, 2005 ME 86, 877 A.2d 1083, 1088 (Me. 2005)).  This inquiry requires the Court to consider the words in their context and assess how a reasonable listener or reader would understand them, rather than construing the words as negatively as possible.  *See Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir. 2015) (citing *Bakal*, 583 A.2d at 1030; *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 108 (1st Cir. 2000); *Picard v. Brennan*, 307 A.2d 833, 835 (Me. 1973)).  A statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  *Rippett*, 672 A.2d at 86 (quoting *Bakal*, 583 A.2d at 1029).

At the outset, the Court is unconvinced that the statements by Ms. Lexow, as pleaded in the Complaint, are actually false.  Regarding the sexual assault allegation, the Complaint alleges only the following: "[Ms.] Lexow informed [Mr.] Hall that he was being accused of sexual assault . . . [however, Ms.] Lexow refused to tell [him]

who had accused him of sexual assault, the alleged nature of the sexual assault, or where or when it had allegedly occurred." *Compl.* ¶¶ 87-88.  Even when the Court accepts, as it must at this stage, that the underlying accusation was false, the Court reads Ms. Lexow's statement to say only that an accusation had been received—not also that the College had determined the allegation to be meritorious, was taking punitive action, or was otherwise endorsing the accusation in any way besides reporting it to Mr. Hall.

The statement that Mr. Hall "was being accused of sexual assault" would only be factually untrue if Ms. Lexow lied about an allegation having been received or if she had invented it out of whole cloth.  But Mr. Hall's Complaint does not allege that Ms. Lexow fabricated the accusation.  Instead, Mr. Hall appears to acknowledge that an accusation was made to the College, later criticizing it for not giving him information regarding any steps it took "to investigate and clear [him] of the sexual assault allegations made on an unknown date by an unknown woman at [an] unknown location." *Id.* ¶ 99.  The Complaint does not suggest that College endorsed or adopted the accusation as its own.  Thus, the allegations do not support Mr. Hall's contention that Ms. Lexow's statement informing Mr. Hall that the College had received such an allegation was itself false, and it cannot form the basis of a defamation claim.

Regarding the sex-for-recruits claim, the Complaint says: "[Ms.] Lexow informed [Mr.] Patterson that he was accused of soliciting college students to have

sex with football players whom he and [Mr.] Hall had recruited to Bates."[10]  *Id.* ¶ 112.

Despite the fact that the allegation in paragraph 112 addresses Mr. Patterson only,

the Court has charitably relied on Mr. Hall's threadbare assertion in the introduction

section of the Complaint that the College "fabricat[ed] claims" against both Mr. Hall

and Mr. Patterson, stating that both men had solicited students to have sex with

recruits.  *Compl.* at 2.   Unlike the sexual assault allegation, there is enough in the

Complaint for the Court to conclude that Bates knew the allegation was false, because

Mr. Hall is alleging that Bates "fabricated" the sex-for-recruits claim against him,

implying that the allegation was not only false but that Bates knew it was false.

Even if the statements were false and thus satisfied the first element of

defamation, Mr. Hall's claim would still fail for lack of unprivileged publication to a

third party.  The Complaint does not allege that Ms. Lexow shared either accusation

with any third party, the second element of a defamation claim under Maine law.

The absence of an allegation of publication would typically be fatal to a defamation

---

[10]     As the Court noted earlier, there is a contradiction in the Complaint as to whether Ms. Lexow informed only Mr. Patterson that he had been accused of soliciting students to have sex with football recruits or whether Bates informed Mr. Hall that he and Mr. Patterson had been so accused.  *Compare Compl.* ¶ 112 ("On December 10, 2019, Title IX Officer Lexow informed Coach Patterson that he was accused of soliciting college students to have sex with football players whom he and Coach Hall had recruited to Bates"); *with Compl.* at 2 ("[T]he College . . . subjected him to repeated and severe racial discrimination by, among other things: fabricating claims that he and the same coordinator had arranged for students to have sex with football recruits").  In its motion, the College contends that this statement pertains only to Mr. Patterson, not Mr. Hall.  *Def.'s Mot. to Dismiss* at 16-17.
        In his opposition memorandum, Mr. Hall clarifies that the Complaint alleges that the sex-for-recruits allegation was made against both Mr. Patterson and Mr. Hall.  *Pl.'s Opp'n* at 8 ("The next in the continuing litany of racially charged allegations levied against Coach Hall occurred less than two months later when Coach Hall was informed by Bates that he and Coach Patterson stood accused of the outrageous action of soliciting Bates students to have sex with football recruits who were on campus to tour Bates as part of their college selection process").  Based on Mr. Hall's memorandum and the language in one part of the Complaint, the Court accepts Mr. Hall's clarification that Bates told him that a sex-for-recruits accusation had been made against Mr. Patterson and him.

claim. *See Green v. Me. Sch. Admin. Dist. 77*, 52 F. Supp. 2d 98, (D. Me. 1999) (holding that, absent evidence that defendant showed plaintiff's job performance evaluation to a third party, there was no publication).

In his memorandum, Mr. Hall claims that the sex-for-recruits allegation was directly published "to at least Charlene Holmes." *Pls.' Opp'n to Mot. to Dismiss* at 18-19 ("With respect to the publication element, there is alleged to have been direct publication to at least Charlene Holmes. . ..").  Yet the only reference to Ms. Holmes in the Complaint states: "[t]his process [of organizing recruit visits] was under the control of Charlene Holmes, a Black woman . . . [who] separated from employment at Bates shortly after these false and racially charged allegations of sexual impropriety were made against Patterson and Hall." *Compl.* ¶¶ 116-17.  Nowhere does Mr. Hall state or even suggest that anyone published Ms. Lexow's sex-for-recruits statement to Ms. Holmes.

Mr. Hall's fallback position on publication rest on the theory of "compelled self-publication." *Pls.' Opp'n to Mot. to Dismiss* at 18-19 ("With respect to the publication element, . . . this accusation is one that Coach Hall must explain to each potential employer for the remainder of his career").  Compelled self-publication may occur where "the originator of the defamatory statement has reason to believe that the defamed person will be under strong compulsion to disclose the contents of the defamatory statement to a third person," requiring courts to "inquire as to whether the employer-defendant knew or could have foreseen that the plaintiff would be

compelled to repeat the defamatory statement." *Carey,* 910 F. Supp. at 11.[11] Compelled self-publication, however, requires evidence that the plaintiff did in fact self-publish. *See Flood v. Bank of Am. Corp.*, 780 F.3d 1, 14 (1st Cir. 2015) (affirming summary judgment on defamation claim because plaintiff "has not presented any actual evidence of self-publication"). Mr. Hall's Complaint does not allege that he has ever actually been required to self-publish and the Court cannot infer from the allegations in the Complaint that he is likely to be forced to address these accusations in the future.

Mr. Hall also fails to sufficiently establish the compelled self-publication element for the sexual assault allegation. In his opposition, he offers only that he has alleged "the significant harm this will cause [him] in connection with his future employment prospects, satisfying both the actual damages and publication elements of a defamation claim." *Pls.' Opp'n to Mot. to Dismiss* at 18 (citing *Carey,* 910 F. Supp. at 10-13. However, because he does not allege any actual self-publication, this theory is insufficient as a matter of law.[12] *See Flood*, 780 F.3d at 14.

---

[11] As authors Simmons, Zillman and Furbish point out, the Maine Supreme Judicial Court "has not addressed the issue of defamation by forced publication." Jack H. Simmons, Donald N. Zillman & Robert H. Furbish, Maine Tort Law § 13.10 (2018 ed.). Nevertheless, this Court accepts the prediction that if presented with the issue, the Law Court would "recognize this unusual tort of self-defamation." *Id.*; *see Carey*, 910 F. Supp. at 10-13; *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 13, n.10 (1st Cir. 2015).

[12] Even if Mr. Hall had self-published either statement, the Court would need to "inquire as to whether the employer-defendant knew or could have foreseen that the plaintiff would be compelled to repeat the defamatory statement." *Carey,* 910 F. Supp. at 11. The Court is unconvinced by Mr. Hall's assertion that he was or will be compelled to explain the statements to future employers. He does not allege that there is any record of the allegations or related disciplinary action in his personnel files, nor offer any other theory as to how a potential employer would be aware of them. Regardless, the question is moot because Mr. Hall has not factually alleged actual self-publication.

Finally, Mr. Hall's Complaint fails to show "fault amounting at least to negligence on the part of the publisher." *Cain,* 2020 U.S. Dist. LEXIS 203446, at *5-6. Where a plaintiff "ha[s] not offered the factual underpinning necessary for the inference that the statements were false in the first place, their allegations that the [defendant] acted negligently fall short." *Pan Am Sys. v. Chalmers Hardenbergh*, 871 F. Supp. 2d 6, 17 (D. Me. 2012). Ms. Lexow was the College's Title IX Officer. While her specific duties are not outlined in the record, Title IX Officers are normally tasked with handling allegations of sexual assault on their college campus. The Court struggles to envision a scenario where a Title IX Officer receives a sexual assault or misconduct accusation and, by merely informing the accused (and no one else) that the allegation has been made—even if unfounded—thereby defames the accused with "fault amounting to at least negligence." Even if such a situation were to be possible, Mr. Hall has not pleaded it here.

The Court GRANTS Bates College's Motion to Dismiss Count V of the Complaint without prejudice.

### 4.    Counts VI-IX: The Negligence Claims

While the Complaint pleads the first five claims on behalf of Mr. Hall, Counts VI-IX allege negligence by the College against Mrs. Hall and the couple's three minor children. These counts are identical except for the alleged victim, contending that the College "negligently failed to inform [Mr.] Hall and his family that it had previously and unsuccessfully attempted to remediate black mold in the Ware Street House . . . pos[ing] a health and safety risk" and as a result Mrs. Hall and the children

"suffered and continue[] to suffer physical and emotional damages." *Compl.* ¶¶ 152-63.

A landlord is not liable for injuries caused by a dangerous condition on property that is under a tenant's exclusive control except when the landlord "(a) fails to disclose the existence of a latent defect which he knows or should have known existed but which is not known to the tenant nor discoverable by him in the exercise of reasonable care; (b) gratuitously undertakes to make repairs and does so negligently; or (c) expressly agrees to maintain the premises in good repair." *Boles*, 2021 ME 49, ¶ 7, 260 A.3d at 700 (quoting *Nichols v. Marsden*, 483 A.2d 341, 343 (Me. 1984)). The Halls allege negligence under the first and third theories: failure to disclose a latent defect and violation of an express agreement to maintain the premises in good repair. *See Pls.' Opp'n to Mot. to Dismiss* at 19 (quoting *Boles*, 2021 ME 49, ¶ 7, 260 A.3d at 700). The Court considers those arguments in turn, finding that the Halls have pleaded the essential elements of each.

### a. Failure to Disclose a Latent Defect

For the Halls to prevail on this theory, they must provide sufficient evidence that the College was aware or should have known of the existence of a latent defect, failed to disclose it, and the defect was not known to the Halls nor discoverable by them in the exercise of reasonable care. *Boles*, 2021 ME 49, ¶ 7, 260 A.3d at 700. The Halls moved into the Ware Street House on July 27, 2018. *Compl.* ¶ 63. At a later, unspecified date Mr. Hall "learned that the College had previously—and unsuccessfully—attempted to repudiate black mold in the house." *Id.* ¶ 80. At no

63

time before the family moved in did the College inform them of the presence of the mold or the unsuccessful attempts to remediate it. *Id.* ¶ 81. Then, in August 2019, Mr. Hall reported the mold issue to the College, notified it that he was scheduling medical appointments to determine whether it had affected his family's health, and informed Bates that he had contacted SERVPRO to evaluate the situation. *Id.* ¶¶ 82-84. At face value, the Halls appear to have pleaded the requisite elements: the College knew of the defect, failed to disclose it, and it plausibly was not known or not readily discoverable by the Halls at the time they moved in.

Even so, Bates contends that the Halls have failed to state the elements of a failure to disclose claim. At the outset, Bates acknowledges that despite a lack of details regarding how or when the Halls learned of the mold and prior remediation attempts, "[i]t might nevertheless suffice, for purposes of notice pleading, to plausibly allege the landlord's knowledge of the latent defect presence of mold, were it not for what is, and is not, included in [the Halls'] other allegations." *Def.'s Mot. to Dismiss* at 18. Its two objections relate to the absence of a "landlord's right of access" and the elapsed time before the Halls reported the mold. *Id.* at 18-19.

The former objection is misplaced. The College contends that the Halls "do not allege that the College reserved any right of access to the premises that would vitiate the 'exclusive control' of the tenant that was at issue in *Boles*" and thus the College did not have "control sufficient for purposes of liability." *Id.* at 19. This argument misreads *Boles*. In *Boles*, the Law Court stated that "[a] landlord is not liable for injuries caused by a dangerous condition on property that is under a tenant's

64

exclusive control *except* when the landlord . . . fails to disclose the existence of a latent defect." 2021 ME 49, ¶ 7, 260 A.3d at 700 (emphasis added). Failure to disclose a latent defect is one of the three enumerated exceptions to the general rule that a landlord is not liable when the tenant has exclusive control. Exclusive control was only "at issue in *Boles*," *Def.'s Mot. to Dismiss* at 19, because the defect in that case was not latent. *See* 2021 ME 49, ¶ 21, 260 A.3d at 704 (defect was not "the type of concealed 'nuisance' that was contemplated in [a previous case]" and the latency distinction "is consistent with the legal principle that a landlord is liable for injuries caused by a latent defect when that defect is hidden from knowledge as well as from sight and one which could not be discovered by ordinary and reasonable care") (internal quotation marks omitted). As the College recognizes that the Halls "are alleging that the mold was in fact a latent defect," *Def.'s Mot. to Dismiss* at 19, the College's lack of access or control after the Halls moved into the home does not undermine their negligence claims.

The College's second objection, arguing that because the Halls did not discover the mold for a year "there is no plausible basis" to believe the College had knowledge of its presence, similarly falls short. *Id.* at 19-20. The Complaint alleges that the College identified the Ware Street House for the Halls, then delayed their move-in, and during this delay Mr. McIntosh assured "[Mr.] Hall that [the College] was working to secure housing" for the Halls and that "any work necessary for health and safety purposes" would be done at the College's expense. *Compl.* ¶¶ 40, 59-62. The Complaint further alleges that it was "[i]n the days and weeks after Coach Hall and

his family moved into the Ware Street House," they recognized that "the house needed significant work to make it an acceptable place to live from a habitability perspective, among others." *Compl.* ¶ 78. The Complaint adds that Mr. Hall later learned that the College had unsuccessfully attempted to remediate black mold in the home. *Id.* ¶¶ 80, 153 ("Bates negligently failed to inform Coach Hall and his family that it had previously and unsuccessfully attempted to remediate black mold in the Ware Street Hours, and that the Ware Street House posed a health and safety risk").

A reasonable jury could conclude from these alleged facts that the College became aware of mold while doing repair work on the house before the Halls moved into the house, that the College failed to warn them about the mold, that this mold was not immediately apparent to the Halls, and that the mold caused injury to the Halls. The Halls have thus established each of the elements necessary to support their claims that the College negligently failed to disclose a latent defect.

### b. Express Agreement to Repair

The Halls alternatively contend that "the Complaint alleges the existence of an express agreement on Bates's part to ensure that Bates would do whatever was necessary, at its own expense, to ensure the Ware Street House was a healthy and safe environment for [Mr.] Hall's family." *Pls.' Opp'n to Mot. to Dismiss* at 20. Specifically, it alleges that in a conversation with Mr. McIntosh, Mr. Hall stated that the house "would be an acceptable place to live as long as work could be done to make it fit, healthy, and safe for his family to live there" and Mr. McIntosh "reassured [him] that any work necessary for health and safety purposes, among others, would be done

66

at Bates' expense." *Compl.* ¶ 62.  The College counters that "[its] commitment as alleged by [the Halls] is for the period before the move-in; the Complaint neither states nor even implies that it will continue in the future." *Def.'s Reply in Supp. of Mot. to Dismiss* at 6.  The Halls have the better argument.

A landlord is not liable for injuries caused by a dangerous condition on property under a tenant's exclusive control except when the landlord ". . . expressly agrees to maintain the premises in good repair." *Boles,* 2021 ME 49, ¶ 7, 260 A.3d at 700 (quoting *Nichols*, 483 A.2d at 343).  The Law Court in *Nichols* considered an oral statement by prospective landlords that they "would take care of any major repair work including areas such as the roof or the plumbing and electrical systems." 483 A.2d at 344.  The Law Court vacated summary judgment for the landlords on the grounds that "[s]uch a promise, made in the course of negotiating an oral lease agreement, would be a sufficient ground on which to establish liability for failure to maintain those areas of the house in good repair." *Id.*

As outlined in the Complaint, Mr. McIntosh's promise states broadly that the College would do "any work necessary for health and safety purposes."  The College may ultimately prove correct that Mr. McIntosh was only referring to work before the Halls moved in, but nothing in the record suggests such a temporal limitation and the Court finds it at least plausible that this oral promise created an ongoing express agreement similar to the one in *Nichols*.  A reasonable jury could conclude that the College's failure to remediate the mold violated this express agreement.

The Court concludes that the Halls have pleaded adequate facts to support their claims that the College acted negligently, either by failing to disclose a latent defect or by violating an express agreement to maintain the premises in good repair. The Court DENIES Bates College's Motion to Dismiss as to Counts VI-IX.

## VI.   CONCLUSION

The Court GRANTS in part and DENIES in part Bates College's Motion to Dismiss the Complaint for Failure to State a Claim (ECF No. 21).  The Court DISMISSES without prejudice Count V but DENIES the motion as to Counts I-IV and VI-IX.  The Court DENIES Bates College's Motion to Strike (ECF No. 11).


SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 7th day of December, 2022